# United States Court of Appeals
## For the First Circuit

No. 14-1142

UNITED STATES OF AMERICA,

Appellee,

v.

PEDRO LOPEZ-COTTO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Michelle Menken, with whom The Law Office of Michelle Menken was on brief, for appellant.
John Starcher, Attorney, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

February 27, 2018

**LIPEZ**, **Circuit Judge**.  Appellant Pedro Jose Lopez-Cotto ("Lopez"), a police officer in the City of Lawrence, Massachusetts, was indicted on charges of participating in a bribery scheme whereby he referred large numbers of vehicle towing requests to M & W Towing in exchange for a stream of benefits that included discounts on the purchase of abandoned cars and equipment.  After a jury trial, Lopez was convicted of federal program bribery, lying to a federal agent, and obstructing justice while attempting to cover up the scheme.

In this appeal, Lopez argues that the district court's jury instructions effected a constructive amendment of the indictment on the bribery count.  He also argues that the inclusion of a unanimity instruction in the jury charge on the particular benefits included within the "stream of benefits" alleged by the government on the bribery count prejudiced him by confusing and misleading the jury.  Additionally, he claims that the court admitted impermissible evidence of past bad acts and failed to adequately instruct the jury about the testimony of immunized cooperating witnesses.

After careful review of the record and the law, we affirm.

We recount the facts of the case as presented at trial, reserving additional details of the testimony and procedural history for the analysis that follows.

M & W Towing is a business owned by Wilson Calixto, a friend of Lopez. Lopez also knew Carlos Ortiz, one of M & W's tow truck drivers, and Mayra Colon, the secretary at M & W. In June 2011, FBI agents visited M & W Towing to ask Calixto about a snow plow that Lopez had purchased from a third party earlier that year. Lopez had bought the plow for $4,000 using a check signed by Calixto and drawn from M & W's account. Calixto told the FBI agents that Lopez had never reimbursed him for the cost of the plow.

After the FBI left, Lopez and Calixto spoke about the FBI's visit. Lopez told Calixto that it was unethical for him to receive the plow and he could face suspension or jail. Colon, M & W's secretary, convinced Calixto that he should change his story to help Lopez. She suggested that Calixto tell the FBI that Lopez had reimbursed M & W, but he had forgotten because he was drunk at the time of the FBI agents' visit. To support this story, Colon created a fake receipt showing that Lopez had reimbursed M & W for the $4,000 in February 2011. When the FBI visited M & W again, both Colon and Calixto told the agents that Lopez had paid for the snow plow. Around the same time, Lopez gave the FBI the fake

receipt and told FBI agents that he had reimbursed M & W for the plow.

Eventually, Calixto, Colon, and Ortiz all agreed to cooperate with the government in exchange for immunity. This cooperation led to Lopez's indictment on charges of federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B), making a false statement to a federal agent in violation of 18 U.S.C. § 1001, and obstruction of justice in violation of 18 U.S.C. § 1512(c)(2). Lopez pleaded not guilty. Calixto, Colon, and Ortiz testified at Lopez's trial.

There, the government presented evidence that Lopez had been illegally using his position as a police officer to receive benefits from M & W. During the relevant time period, the City of Lawrence contracted with four towing companies, one of which was M & W. These four companies towed vehicles for the Lawrence Police Department one week per month during each company's respective "police week." During that assigned week, patrolmen like Lopez would call the company whenever they needed a vehicle to be towed due to a violation, such as illegal parking or unlicensed driving. In return, the towing companies earned money from the tows, either from fees paid by the vehicle's owner when the owner claimed the car or from the sale of abandoned cars. On average, M & W earned $145 each time an owner reclaimed his or her towed car.

The government presented evidence that Lopez abused this towing system. Ortiz testified that Lopez approached him in December 2010 to inquire about a Suzuki Reno that had been abandoned in M & W's lot. M & W was asking $4,500 for the vehicle, but Lopez proposed that he pay $1,000 in cash and then refer for towing at least 35 vehicles during M & W's police week. Ortiz relayed the proposal to Calixto, who calculated that the value of the tows plus the $1,000 in cash was worth much more than his asking price. Calixto testified that he also became worried that if he did not agree to Lopez's proposal, Lopez would "shut off" M & W and prevent it from towing vehicles during its police week. Lopez had mentioned to Calixto that after another towing company, Valley Towing, refused to give him a discount, he decided that "he wouldn't tow no vehicles for that company unless it was really necessary." Calixto accepted Lopez's offer for the Suzuki.

The government corroborated Calixto's testimony with evidence that Lopez ordered many more cars towed during M & W's police weeks in December 2010 and January 2011 than he had during the same months of the previous year. Calixto also testified that, after this increase, Lopez began to show interest in additional abandoned vehicles on M & W's lot. As a result, Calixto sold Lopez a Ford Escape for $1,000, despite an asking price of $1,500, and he gave Lopez a Nissan Altima without any direct payment. Calixto further testified that he bought Lopez a new engine for the Altima

- 5 -

after the car began experiencing mechanical problems. Lastly, in February 2011, Lopez asked Calixto for a snow plow to attach to his truck. In response, Calixto gave Lopez a blank, signed check drawn from M & W's account for the purpose of purchasing a plow -- the transaction about which the FBI agents later questioned Calixto during their June 2011 visit to M & W.

Calixto admitted at trial that he and Lopez never explicitly discussed trading a specific number of tows for the Escape, the Altima, the car engine, or the plow. However, Lopez continued to refer a high volume of tows to M & W, and Calixto felt that the tows served as adequate compensation for these items. The government bolstered Calixto's testimony with evidence showing that Lopez continued to request more tows during M & W's police weeks through June 2011 -- excluding the month of April -- than he had during the same months the year before. According to Calixto, Lopez explained the April slow-down as a reaction to his fear that he was being investigated.

During closing arguments, the government stated that Lopez had directed a total of 162 tows to M & W during the period in question. Multiplied by an average of $145 in fees earned for each non-abandoned car, those tows came to approximately $23,000 in revenue for M & W. The jury found Lopez guilty on all three counts. Lopez was sentenced to 18 months of incarceration followed

- 6 -

by 36 months' supervised release, and was ordered to pay a fine of $10,000. He timely appealed his conviction.

Lopez makes four arguments on appeal: (1) a combination of problems with the jury instructions on the bribery charge effected a constructive amendment of the indictment; (2) the unanimity instruction, requiring the jury to agree unanimously on the particular benefit or benefits included within the "stream of benefits" alleged by the government on the bribery charge, was, on its own, confusing, misleading, and prejudicial; (3) the court erred in admitting testimony about Lopez's past actions toward Valley Towing; and (4) the jury was inadequately instructed on how to evaluate the credibility of immunized cooperating witnesses. We consider each of these arguments in turn.

**II.**

Lopez contends that several errors in the jury instructions on the bribery charge, taken together, constituted a constructive amendment of the indictment. "[A] constructive amendment occurs where the crime charged has been altered, 'either literally or in effect,' after the grand jury last passed upon it." United States v. Mubayyid, 658 F.3d 35, 49 (1st Cir. 2011) (quoting United States v. Bunchan, 626 F.3d 29, 32 (1st Cir. 2010)). Lopez asserts that the flawed instructions improperly allowed the jury to find him guilty based on an agreement for a

single benefit rather than, as he was charged, an agreement for a "stream of benefits."

Lopez concedes that he never raised this constructive amendment issue in the district court. Plain error review, therefore, applies.  See United States v. McIvery, 806 F.3d 645, 651 (1st Cir. 2015).[1]  To meet the plain error standard, Lopez must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).[2]

Before examining the asserted instructional errors that Lopez contends resulted in a constructive amendment, we briefly

---

[1]  In McIvery, we clarified that "[f]orfeited errors are normally reviewed only for plain error, and forfeited constructive amendment claims are no exception." 806 F.3d at 651 (internal citations omitted); see also United States v. Brandao, 539 F.3d 44, 60 (1st Cir. 2008) ("We agree with those circuits that apply the standard prejudice evaluation to constructive amendment claims on plain error review and do not presume prejudice.").

[2] Constructive amendments present serious concerns about a defendant's substantial rights, implicating, inter alia, a "defendant's Fifth Amendment right to indictment by grand jury" and a "defendant's Sixth Amendment right to be informed of the charges against him."  McIvery, 806 F.3d at 652.

review the bribery statute under which he was convicted, 18 U.S.C.
§ 666, and the allegations in the indictment.

## A. The Statute

The federal program bribery statute, in relevant part,
prohibits public officials[3] from

> corruptly solicit[ing] or demand[ing] for the benefit of
> any person, or accept[ing] or agree[ing] to accept,
> anything of value from any person, intending to be
> influenced or rewarded in connection with any business,
> transaction, or series of transactions of [the relevant
> state or local government agency] involving any thing of
> value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B).  In other words, a violation of
§ 666(a)(1)(B) occurs when a government official exchanges
government business worth at least $5,000 for a benefit to the
official.

The actions of government officials can run afoul of
§ 666(a)(1)(B) in different ways.  A government official violates
§ 666(a)(1)(B) if he exchanges or agrees to exchange $5,000 of
government business for a single benefit.  For example,
§ 666(a)(1)(B) would be violated if an official awarded or agreed
to award government contracts worth a total value of $5,000 (or
more) to a landscaping company in exchange for the company's

---

[3] The statute applies only to officials of state, local, or
Indian tribal governments, or governmental agencies, that
"receive[], in any one year period, benefits in excess of $10,000
under a Federal program."  18 U.S.C. § 666(b).  It is undisputed
that this jurisdictional requirement is met in this case.

discounted, one-time landscaping of the official's backyard. Alternatively, an official violates § 666(a)(1)(B) if he exchanges or agrees to exchange $5,000 of government business for a series of benefits. To use a similar example, a § 666(a)(1)(B) violation would occur if a government official awarded or agreed to award government contracts worth a total of $5,000 (or more) to a landscaping company in exchange for the official's receipt, over time, of a series of discounted landscape work at his home. See United States v. McDonough, 727 F.3d 143, 154 (1st Cir. 2013) (stating that "[b]ribery can be accomplished through an ongoing course of conduct" (quoting United States v. Ganim, 510 F.3d 134, 149 (2nd Cir. 2007)).[4]

The latter scenario would permit a "stream of benefits" prosecution approach, wherein a government official is charged with entering into an ongoing agreement to accept benefits in exchange for providing government business to the briber.[5] When a defendant is indicted on the stream of benefits approach, the

---

[4] These scenarios are illustrative only, and we do not suggest that they describe all fact patterns in which a government official might violate § 666(a)(1)(b).

[5] Although the case law on "stream of benefits" mostly involves cases of honest services fraud, both parties accept its applicability in the context of program bribery. Cf. United States v. Sawyer, 85 F.3d 713, 730 (1st Cir. 1996) (holding that "a person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action"); United States v. Kemp, 500 F.3d 257, 282 (3d Cir. 2007).

prosecution must prove an agreement for the ongoing stream of benefits rather than an agreement for stand-alone bribes. The prosecution need not, however, link the value of the government business conferred to any particular benefit received by the official. Rather, the government must show that, in the aggregate, under the ongoing scheme, the government business conferred had a value of at least $5,000.

## B. The Indictment and the Jury Instructions

In colloquies with counsel during trial, the district court expressed concern about the government's ability to prove the indictment's allegation that Lopez agreed to accept a "stream of benefits." Count One of the indictment alleged that Lopez "corruptly solicited and demanded, and accepted and agreed to accept, a stream of benefits from [M & W Towing], including, but not limited to, a free $4,000.00 snow plow," in exchange for using his position as a Lawrence patrolman to direct at least $5,000 worth of tows to M & W. Acknowledging that the government had presented evidence of an initial agreement to exchange tows for a discount on the Suzuki, the court questioned whether there was evidence of an agreement to continue that exchange in relation to other benefits. The court worried, however, that allowing the government to change its theory to prove only one benefit, rather than a "stream of benefits," would be a constructive amendment of the crime alleged in the indictment. To avoid that problem, the

- 11 -

court decided to charge the jury on the stream of benefits theory, reserving its final judgment on whether there was sufficient evidence to support that approach.[6]

Notwithstanding the court's decision to proceed with a "stream of benefits" jury charge, Lopez identifies three aspects of the instructions which, taken together, still effected, in his view, a constructive amendment of the indictment by permitting the jury to convict him of program bribery based on the single benefit approach. First, he faults the district court for not explicitly defining the concept of a "stream of benefits." Second, he claims that the court's decision to deliver a unanimity instruction[7] improperly implied that the "stream," an undefined concept, could consist of only one item. Lastly, he asserts that the portion of the instruction explaining that the government had to show that "any proven bribe" involved at least $5,000 of towing business could have, inadvertently, reinforced the idea that the jury could convict Lopez based on a single benefit, rather than on a "stream

---

[6] After the jury returned a guilty verdict on all counts, the court denied Lopez's renewed motion for judgment of acquittal. See Fed. R. Crim. P. 29.

[7] We discuss the unanimity instruction in detail in section III. Essentially, the judge told the jury that, in addition to unanimously finding a stream of benefits, the jury had to unanimously agree upon at least one of the component benefits which comprised the stream.

of benefits."[8]  The cumulative impact of these problems, Lopez claims, was an instruction to the jury that described, in effect, a crime different from the crime charged in the indictment.

Although Lopez draws our attention to three specific aspects of the jury charge, we must look at the instructions "as a whole" to determine if error occurred.  United States v. Candelario-Santana, 834 F.3d 8, 27 (1st Cir. 2016) (inquiring whether the instructions "as a whole . . . adequately explain the law without confusing or misleading the jury" (quoting United States v. Fermin, 771 F.3d 71, 80 (1st Cir. 2014))).  The court's instructions on the bribery charge included the following language pertinent to Lopez's constructive-amendment claim:

> In Count 1, it is alleged, among other things, that the defendant solicited, demanded, accepted, or agreed to accept a stream of benefits from M & W Towing in exchange for directing tows to the company.  The government argues that these benefits included the opportunity to buy a Suzuki at a discounted price, the opportunity to buy a Ford Escape at a discounted price, the opportunity to get a Nissan Ultima free or at a discounted price, and a free snow plow.  The government is not required to prove that the defendant solicited, demanded, accepted, or agreed to accept every one of these alleged benefits, however for the defendant to be found guilty on Count 1 the government is required to prove that the defendant corruptly solicited and demanded, accepted, or agreed to accept a stream of benefits that included at least one of them.

---

[8] The $5,000 threshold requirement of § 666 pertains to the value of the government business conferred in the transaction -- the value of the tows supplied by Lopez -- not to the value of the benefits Lopez received.

- 13 -

To find that the government has proven this, you must agree unanimously on which particular benefit or benefits Mr. Lopez corruptly solicited, demanded, accepted, or agreed to accept from M & W Towing as part of an agreement to corruptly receive a stream of benefits. It would not be enough for some of you to find that the government has proven an agreement to accept one or more of the alleged benefits while the rest of you find the government has proven that the defendant agreed to accept one or more of the other alleged benefits. You would all have to agree that the government has proven an agreement to accept at least one particular alleged benefit as part of an agreement to accept a stream of benefits in order to find the defendant guilty on Count 1.

. . .

The fourth element the government is required to prove in order to achieve a conviction on Count 1 is that any proven bribe involved some business transaction or series of transactions of the City of Lawrence Police Department worth at least $5,000. In this case this means that the government must prove that the alleged bribe involved towing business worth at least $5,000, that is $5,000 or more, to M & W Towing.

To be sure, parts of these instructions were imperfect. The court focused, at times, on a single benefit when the alleged crime -- per the indictment -- was an agreement for Lopez to receive multiple benefits, over time. In addition, the unanimity instruction -- the second paragraph reproduced above -- focused on a single benefit in expressing the need for the jury to "agree unanimously on which benefit or benefits" Lopez received. Indeed, as the government all but concedes, the unanimity instruction was

- 14 -

unnecessary, and it should not have been given.  See infra Section

III.

Nevertheless, when we consider the full charge on Count One, we find no error, let alone a plain error, that shifted the theory of the case from a "stream of benefits" prosecution to a single benefit prosecution.[9]  The instructions repeatedly emphasized that the alleged object of Lopez's agreement with Calixto was a "stream of benefits."  The relevant instructions started with the court's explanation that the indictment alleged that Lopez "solicited, demanded, accepted, or agreed to accept a stream of benefits." (Emphasis added).  A few sentences later, the court stated that, for the defendant to be found guilty, "the government is required to prove that the defendant corruptly solicited and demanded, accepted, or agreed to accept a stream of benefits." (Emphasis added).  Even when giving the unanimity instruction, the court made clear that whatever particular benefit the jury unanimously found, such a benefit must have been "part of an agreement to corruptly receive a stream of benefits." (Emphasis added).  At no point during the charge were the jurors told they

---

[9] The government contends that even if the instructions permitted the jury to convict based on a single benefit in the manner alleged by Lopez, the distinction between a single benefit and a stream of benefits -- both "things of value" under § 666(a)(1)(b) -- would not amount to a constructive amendment.  We need not address that assertion, however, as the jury instructions did not permit the jury to convict based on a single benefit.

- 15 -

could find Lopez guilty of anything but the solicitation, the demanding, the acceptance, or the agreement to accept a "stream of benefits."

Moreover, although Lopez specifically criticizes the "any proven bribe" language used in the $5,000 jurisdictional section of the instructions, this language is an accurate representation of the law. In a stream of benefits prosecution, the relevant "anything of value" is the singular bribe of an ongoing stream of benefits. Hence, the court's statement that "the alleged bribe involved towing business worth at least $5,000" accurately instructed the jury that the stream of benefits must be exchanged for at least $5,000 of government business.

We are satisfied that the challenged instructions, read as a whole, did not permit Lopez's conviction based on the single-benefit approach to § 666(a)(1)(b). Therefore, Lopez's constructive amendment claim fails.[10]

---

[10] We reject Lopez's assertion, in a letter filed under Federal Rule of Appellate Procedure 28(j), that he raised a prejudicial variance claim in his opening brief. See Mubayyid, 658 F.3d at 48 (stating that "[a] variance occurs when the facts proved at trial differ materially from those alleged in the indictment without altering the crime charged"). We find no instance, neither in the district court nor in his opening brief, where Lopez raises a prejudicial variance claim. Although his reply brief contains a passing reference to "[t]he consequence of a variance," we have held that "a legal argument made for the first time in an appellant's reply brief comes too late and need not be addressed." United States v. Brennan, 994 F.2d 918, 922 n.7 (1st Cir. 1993) (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992)).

If his constructive amendment claim fails, Lopez asserts that his bribery conviction must still be vacated because the erroneous unanimity instruction so confused and misled the jury that it caused him prejudice. The unanimity instruction, reproduced above, required the jury to reach a unanimous finding on at least one specific benefit that Lopez agreed to accept as part of the stream of benefits. Lopez argues that he preserved this claim when he requested in a written court filing that a unanimity instruction not be included in the jury instruction. He did not, however, object to its inclusion -- despite an express invitation to do so by the court -- either when the court's proposed instructions were first read during the charge conference, or after the jury was instructed. Consequently, this claim is not preserved and plain error review applies. See United States v. Combs, 555 F.3d 60, 63 (1st Cir. 2009) (holding that a defendant's failure to object to a jury charge "despite an express invitation by the trial judge" results in appellate review "for plain error only").

The government acknowledges that, in giving the unanimity instruction, the district court misapplied our decision in United States v. Newell, 658 F.3d 1 (1st Cir. 2011). In Newell, the defendants were convicted, in part, of misapplying both tribal funds and government and health care funds. On appeal, the

defendants challenged their convictions, claiming that several counts in the indictment were duplicitous. A duplicitous count is one that alleges multiple, discrete criminal acts, each of which could stand alone as a separate crime. The Newell defendants argued that a count which charged them with fraudulently misapplying funds on multiple, independent occasions allowed the jury to convict them when some jurors thought they "had intentionally misapplied funds on only a particular subset of occasions, whereas other jurors could have thought that they had misapplied funds on a different subset of occasions." Newell, 658 F.3d at 20. Agreeing, we held that the district court's failure to give the jury a unanimity instruction in those circumstances constituted error. Id. at 23-28. Without a unanimity instruction, we reasoned, "a jury may return a guilty verdict even if . . . they disagree [] as to which crime or crimes were committed." Id. at 27 (emphasis omitted).

Here, however, Count I against Lopez alleged a single criminal offense -- the agreement to accept a "stream of benefits" in exchange for directing at least $5,000 worth of tows to M & W. That Lopez allegedly received multiple things of value as part of that single agreement does not mean that Count I, as worded, supported multiple stand-alone crimes. Unlike in Newell, the government did not "bundle[] multiple discrete violations of the statute under [a] single count[]" in the indictment. Id. at 21.

- 18 -

Rather, the multiple benefits Lopez received were, as charged, the alleged components of the singular stream of benefits offense. See id. at 27 ("[A] jury may return a guilty verdict even if the jurors disagree about how a specific crime was committed."). Newell does not apply in this context.

Beyond the misapplication of Newell, the court's unanimity instruction was also erroneous because the reference to a specific benefit in the indictment was surplusage. As Lopez acknowledges, that reference to the "free $4,000.00 snow plow" did not mean that the plow, or any of the specific benefits in the stream, was an element of the crime. While such a reference was perhaps helpful in giving the defendant further notice of the crime alleged, its inclusion in the indictment had "no bearing on the substance of the charge." United States v. Dowdell, 595 F.3d 50, 68 (1st Cir. 2010). The indictment's reference to the snow plow "could have been omitted altogether without affecting the sufficiency of the indictment." Mubayyid, 658 F.3d at 53; see also United States v. Miller, 471 U.S. 130, 136, 105 S. Ct. 1811, 1815 (1985) (defining surplusage as "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved [that] may normally be treated as 'a useless averment' [and] 'may be ignored'" (quoting Ford v. United States, 273 U.S. 593, 602 (1927))).

To be sure, the government's proof of the individual benefits received by Lopez was important to its effort to win jury unanimity on the "stream of benefits" element of the crime alleged -- that is, whether Lopez agreed to accept the "stream of benefits" as the quid pro quo for government business conferred on M & W towing. The individual benefits were relevant to the "stream of benefits" theory of the case in that evidentiary sense -- the specifics supported an inference of the general. As charged in the indictment, however, the specific reference to the snow plow was suplusage, and it is improper to instruct the jury to make a unanimous finding on surplusage. The court's decision to include a unanimity jury instruction on the particular benefits within the "stream of benefits" was, therefore, clearly erroneous on both Newell inapplicability and surplusage grounds.

We are unpersuaded, however, that this plain error "affected [Lopez's] substantial rights." McIvery, 806 F.3d at 651. Lopez argues that the inclusion of the unanimity instruction alone "misdirect[ed] the jury's attention away" from its proper task of determining whether a single overarching agreement was proved, and it "increased the likelihood of a conviction by relieving the prosecution of its obligation to prove that the agreement between Lopez and M&W encompassed more than the Suzuki." We disagree.

- 20 -

To the extent any party was prejudiced by the erroneous inclusion of the unanimity instruction, it was the government, not Lopez. The instruction required the government to win jury unanimity not only on the "stream of benefits" element of the bribery charge, but also on at least one of the benefits identified by the government in its proof -- the Suzuki, the Ford, the Altima, the engine, and the snow plow. In effect, the court transformed a factual component of the government's bribery case -- the individual benefits that comprise the stream of benefits -- into an additional element of the crime. This transformation increased the government's evidentiary burden, thereby benefiting Lopez. Thus, we find no violation of Lopez's substantial rights.

**IV.**

Lopez argues that the district court erred by admitting testimony about his decision to "shut off" Valley Towing after that company refused to give him a discount. Calixto testified that, before his initial agreement to sell Lopez the Suzuki, Lopez had commented that he would not direct tows to another company, Valley Towing, because they had refused to give him a discount on a car that had been towed to their lot. Two other witnesses, Edward Scales, who was an M & W tow truck driver, and Laurence

Travaglia, an FBI agent who interviewed Lopez, also testified that Lopez had told them that he would not direct tows to Valley Towing.

Lopez claims that the testimony about his actions toward Valley Towing was improperly admitted prior "bad acts" evidence. See Fed. R. Evid. 404(b); 403. He contends that we should deem his evidentiary claim preserved because he filed a pre-trial motion in limine asking the district court to exclude "any alleged criminal or bad acts of the Defendant . . . with which he is not charged." That motion, however, focused on evidence the government intended to present of Lopez's attempt to initiate a similar scheme with another company, Sheehan's Towing. When the district court ruled on the motion, it addressed only the Sheehan's Towing evidence, provisionally excluding that evidence but permitting the government to raise the issue again at trial. At trial, Lopez did not object when the government solicited testimony about Valley Towing from the three witnesses. "Our rule as to motions in limine is that a party must renew at trial its motion to offer or exclude evidence if there has been an earlier provisional ruling by motion in limine and a clear invitation to offer evidence at trial." Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003). Hence, even if the motion in limine could be construed to encompass the Valley Towing evidence, Lopez failed to preserve his objection by renewing it at trial. We review his forfeited evidentiary objection for

- 22 -

plain error. See United States v. Iwuala, 789 F.3d 1, 5 (1st Cir. 2015).

We follow a two-step process for evaluating the admissibility of evidence of a defendant's prior bad acts. See United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). First, to be admissible under Federal Rule of Evidence 404(b), the evidence must have "special relevance," meaning that it is "specially probative of an issue in the case -- such as intent or knowledge -- without including bad character or propensity as a necessary link in the inferential chain." Id. Second, the probative value of the evidence must not be "substantially outweighed by the danger of" unfair prejudice or another risk outlined in Federal Rule of Evidence 403. Id.

The government argues, and we agree, that Calixto's testimony about Lopez's treatment of Valley Towing has special relevance to the case because it shed light on Calixto's state of mind when the bribery scheme was initiated. See Iwuala, 789 F.3d at 6 (finding that "evidence of a person's reputation may be admitted to show the knowledge or state of mind of some other person"). Just as a tenant's known reputation as a drug dealer may provide a basis for a landlord to know that the tenant's apartment is used for drug trafficking, see, e.g., United States v. 890 Noyac Road, 945 F.2d 1252, 1260 (2d Cir. 1991), or a person's reputation as a fraudster may provide a basis for someone else's

knowledge that a proposed business venture is a scam, see, e.g., Iwuala, 789 F.3d at 6, so too may knowledge of Lopez's treatment of Valley Towing serve to explain Calixto's state of mind when he agreed to Lopez's car-towing scheme. From Calixto's point of view, Lopez's reputation of requesting discounts from multiple towing companies made it more likely that his interest was not limited to the Suzuki. Cf. United States v. Goodoak, 836 F.2d 708, 714 (1st Cir. 1988) (holding that "[a witness's] testimony explaining his state of mind had probative value on the key question of whether [the defendant] had threatened him, because evidence of the result is relevant to whether there was an attempt"). In this context, Lopez's actions toward Valley Towing had special relevance to Calixto's state of mind when Lopez propositioned him. Federal Rule of Evidence 404(b)'s prohibition on the use of prior bad acts was not violated.

Lopez argues that, even if the testimony served a permissible purpose, it was unduly prejudicial in violation of Federal Rule of Evidence 403. He claims that Calixto's testimony about Valley Towing suggested that Lopez was threatening Calixto, and therefore he was guilty of extortion rather than bribery. Extortion, Lopez states, is a more objectionable offense in the minds of jurors because "the public official is the sole wrongdoer" and "the law regards the payor as an innocent victim and not an accomplice." Ocasio v. United States, 136 S. Ct. 1423, 1439 (2016)

(Thomas, J., dissenting). Consequently, he argues that the testimony should not have been admitted, at least without a limiting instruction.

While Calixto's testimony cast Lopez in a negative light, that image was tempered by the fact that Calixto also testified that he "did the numbers" and agreed to the scheme only after he realized that Lopez was offering him the chance to earn "a lot more" money. Thus, the government's evidence did not frame Calixto as simply "an innocent victim." Id. In balancing the potential for undue prejudice from this testimony with its probative value, we cannot say that the district court plainly erred either by admitting Calixto's testimony or by failing to issue a limiting instruction sua sponte. See Iwuala, 789 F.3d at 7 (requiring "clear or obvious error" in the court's admission of evidence to overcome a forfeiture).

That said, the "special relevance" of Calixto's testimony about Valley Towing does not extend to the testimony of the two other witnesses, Scales and Travaglia. It is irrelevant what Scales or Travaglia knew about Lopez's reputation as Lopez never propositioned them with an agreement or scheme. Moreover, information known only to Scales or Travaglia could not have informed Calixto's state of mind. Nevertheless, because the same information about Lopez's "bad act" was properly admitted through Calixto's testimony, we find no harm in the repetition of that

- 25 -

information by other witnesses.  See United States v. Fulmer, 108 F.3d 1486, 1502 (1st Cir. 1997) (finding certain statements about the defendant's bad acts to be cumulative, and therefore harmless, given other testimony about the same bad acts that was relevant to show the witness's state of mind).

**V.**

Lastly, Lopez challenges for the first time the district court's jury instructions on the credibility of the cooperating witnesses.  Again, we review for plain error.  United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016).

During the jury charge, the district court sua sponte gave the following instruction regarding the testimony of coconspirator witnesses Calixto, Colon, and Ortiz:

> Three of the witnesses testified pursuant to court orders that compelled them to testify and gave them certain immunity.  You heard those witnesses explain their understanding of those orders.  I instruct you that the government is entitled to present the testimony of an immunized witness.  Some people who are given immunity are entirely truthful when testifying. However, the testimony of such witnesses, in this case Mr. Calixto, Mr. Ortiz, and Ms. Colon, should be examined by you with greater care than the testimony of an ordinary witness.  You should scrutinize it closely because such a witness may have a motive to testify falsely by making up stories or exaggerating what others did because he or she wants to avoid being prosecuted. As with all the evidence, in deciding whether some or all of the testimony of a witness with immunity is truthful, you should consider, among other things, whether it was contradicted or corroborated by other evidence in the case.  As I said, you should scrutinize the testimony of an immunized witness with great care and rely on it with caution.  If after doing so you find

some or all of his or her testimony to be true, you
should give it whatever weight you believes it deserves.

Lopez did not object.

Lopez now argues that the instruction failed to adequately convey to the jury that Calixto, Colon, and Ortiz were accomplices to the charged bribery and obstruction of justice, and that they could be prosecuted for those offenses if they did not testify truthfully. He claims that the instruction's reference to potential prosecution did not clarify that the witnesses were subject to prosecution for their roles in the offenses at issue in his trial, rather than some unconnected offense.[11] This lack of specificity, in turn, deprived the jurors of information that would help them assess the witnesses' motives. Lopez also contends that this omission furthered the government's supposed narrative that he forced the bribery scheme upon unwilling and vulnerable victims who were not themselves culpable.[12]

---

[11] Lopez notes that, for instance, Calixto testified that he had been audited by the Internal Revenue Service and had to make back payments for unpaid taxes to both the federal and state governments, and also that he paid Colon under the table. Thus, Lopez suggests, the jury could have inferred that Calixto was receiving immunity from prosecution for tax evasion.

[12] Lopez also suggests that Colon and Ortiz testified that they were not receiving immunity from prosecution. This is an inaccurate characterization of the testimony. Although only Calixto specifically acknowledged that he could be "prosecuted in connection with this case," Ortiz testified that if he lied on the stand, he could "be charged." Similarly, Colon testified that she understood her immunity agreement to mean that "if I say all the truth, I won't be incriminated." The prosecutor responded by

We find no error in the challenged instructions on the credibility of cooperating witnesses. Not only is a district court granted "considerable leeway" in choosing the specific language for jury instructions, United States v. Paniagua-Ramos, 251 F.3d 242, 248 (1st Cir. 2001), we have even upheld convictions when no instruction on coconspirator testimony was given, see, e.g., United States v. Newton, 891 F.2d 944, 950 (1st Cir. 1989) ("As this court has noted before, although an accomplice witness instruction is advisable when there is accomplice testimony, its absence does not require reversal."). As long as the instructions "constitute[] a fair statement of the applicable law concerning accomplice testimony," no "magic words" are necessary. Paniagua-Ramos, 251 F.3d at 245-47. Here, the court informed the jury that the three witnesses testified pursuant to court orders, that those orders gave them immunity from prosecution,[13] that the witnesses

---

asking whether she meant that she wouldn't be prosecuted, and she replied, "Yes, prosecuted."

[13] Lopez appears to assert that the witnesses' testimony that they were required to tell the truth to receive immunity improperly bolstered their credibility in the eyes of the jury. He claims that such a statement implied that "the government was monitoring the witnesses' testimony[,] ensuring that the truth be told." We have previously rejected the premise that merely informing the jury about a witness's plea agreement constitutes error. See United States v. Martin, 815 F.2d 818, 821 (1st Cir. 1987) ("We do not agree that informing the jury of the contents of a plea agreement of, at least, normal stripe is error."); United States v. Munson, 819 F.2d 337, 344–45 (1st Cir. 1987) ("A defendant may be denied a fair trial if the prosecution portrays itself 'as a guarantor of truthfulness,'" but "[t]he government's narrow

- 28 -

may have motives to lie or exaggerate to avoid prosecution, and that the jurors should "scrutinize [their] testimony . . . with great care and rely on it with caution."  Hence, the possibility that witnesses would falsify their testimony for their own benefit was expressly stated.  The instructions that the district court delivered on the credibility of the cooperating witnesses were error free.

Affirmed.

---

questions about whether these witnesses agreed to tell the truth were not such portrayals.") (quoting Martin, 815 F.2d at 821).