# United States Court of Appeals
## For the First Circuit

No. 21-1804

UNITED STATES,

Appellee,

v.

EMMANUEL AKOTO, a/k/a Kofi,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Lynch, Circuit Judges.

Sara E. Silva, with whom Hogan Lovells US LLP was on brief, for appellant.
Hannah Cook, Attorney, Tax Division, Department of Justice, with whom David A. Hubbert, Deputy Assistant Attorney General, S. Robert Lyons, Chief, Criminal Appeals & Tax Enforcement Policy Section, Katie Bagley, Attorney, Tax Division, Joseph B. Syverson, Attorney, Tax Division, and Jane E. Young, United States Attorney, were on brief, for appellee.

February 23, 2023

**LYNCH**, **Circuit Judge**.  A New Hampshire federal jury convicted Emmanuel Akoto of one count of conspiracy to commit wire fraud, three counts of substantive wire fraud, and two counts of aggravated identity theft.  These charges were based on evidence of Akoto's participation in an international scheme, involving individuals in the United States, Nigeria, and Ghana, that used stolen identities to file fraudulent federal income tax returns with the Internal Revenue Service ("IRS").  At sentencing, the district court determined that Akoto and his coconspirators had filed at least 310 fraudulent tax returns seeking $1,326,633 in refunds, $551,601 of which the IRS paid out.  Based in part on this loss amount, the district court sentenced Akoto to 70 months' imprisonment, which represented a downward variance from his Guidelines range.

On appeal, Akoto makes three arguments.  First, he contends that his conviction on one of the aggravated identity theft counts should be vacated because his trial counsel's failure to raise a statute of limitations defense to this count amounted to ineffective assistance of counsel.  Second, he argues that his convictions on the three substantive wire fraud counts should be vacated because the district court's jury instructions constructively amended the indictment.  Third, Akoto asserts that his sentence should be vacated because the district court erred in

calculating the loss amount attributable to his conduct. We affirm.

## I.

### A.

We recount the background facts in the light most favorable to the jury's verdict, consistent with record support. See United States v. Tkhilaishvili, 926 F.3d 1, 8 (1st Cir. 2019).

Between 2011 and 2013, Akoto and his coconspirators used stolen identities to file fraudulent federal income tax returns. The scheme worked as follows.

Akoto and his coconspirators first purchased stolen identity information from Hieu Minh Ngo, a Vietnamese hacker. Between 2007 and 2013, Ngo ran an illicit business selling personal identifying information ("PII") over the internet. This information came as "fullz" (or "fulls") packages -- short for "full information" -- that typically included information like an individual's name, Social Security number, date of birth, address, driver's license number, and bank account numbers. Much of this information constituted "means of identification" ("MOI"), as defined at 18 U.S.C. § 1028(d)(7). Ngo maintained an inventory of more than 176,000 fullz and sold fullz to at least 1,300 individuals around the world. Ngo often resold the same fullz to different individuals.

Akoto purchased between 900 and 1,000 fullz from Ngo. Ngo sent Akoto these fullz in email attachments. Akoto routinely requested newly hacked information that would work for the tax fraud scheme. He asked Ngo for "fresh ones" and "the newest info that you have," specified the timeframes he was looking for, and sought information that "would pass" -- i.e., could be successfully used in the scheme.

Ngo was eventually apprehended by American law enforcement and agreed to cooperate. He allowed Secret Service Special Agent Matthew O'Neill to take over his email accounts. Agent O'Neill used Ngo's email to communicate with Ngo's customers, including Akoto, for investigatory purposes.

After receiving the stolen identities, Akoto and his coconspirators "washed" each identity by submitting a tax return to the IRS using that information but deliberately using the wrong date of birth. The IRS typically responded with a rejection letter stating either that (1) the date of birth was incorrect or (2) the date of birth was incorrect and a return for that individual had already been filed. If the former, the coconspirators knew they could file a potentially successful fraudulent tax return using that person's name because the person had not yet filed a tax return for that year. The purpose of "washing" was to avoid purchasing prepaid debit cards (the next step of the scheme) in

- 4 -

the names of individuals for whom a fraudulent return could not be successfully filed.

After a name had been successfully "washed," Akoto and his coconspirators purchased a prepaid debit card in that person's name, filed a fraudulent tax return (this time with the correct date of birth), and routed the refund to the prepaid debit card. The fraudulent returns were often filed by conspirators in Nigeria and Ghana. If the IRS did not detect the fraud and issued a refund to the prepaid debit card, Akoto or a coconspirator withdrew the refund in cash from an ATM.[1] Some of this money was sent to the overseas conspirators by depositing it in different accounts, with the conspirator who withdrew the cash also keeping some.

**B.**

On November 29, 2017, a federal grand jury returned an indictment charging Akoto and codefendant Jeffrey Quaye with six counts: one count of conspiracy to commit wire fraud (Count One), see 18 U.S.C. §§ 1343, 1349; three counts of substantive wire fraud and aiding and abetting wire fraud (Counts Two, Three, and Four), see id. §§ 2, 1343; and two counts of aggravated identity theft (Counts Five and Six), see id. § 1028A(a)(1).

Quaye entered into a plea agreement with the government before trial and testified against Akoto at trial. The government

---

[1] Some refunds were routed directly to bank accounts rather than to prepaid debit cards.

- 5 -

also presented testimony from two other cooperating witnesses: Ngo, the hacker and fullz seller, and Abiola Adeyemo, who was present for a conversation between Akoto and Quaye regarding the scheme and pleaded guilty to participation in a related tax fraud scheme. The government further called as witnesses four government agents and six victims whose PII had been used in the scheme.

Akoto's central defense at trial was that the government could not tie him to the scheme because he did not control the kwa2kg@yahoo.com email account that was used to communicate with Ngo, receive fullz, share fullz with coconspirators, and share other information such as "washed" names. The government introduced evidence that emails sent from the account were sent from an IP address tied to 2047 Paducah Lane, Grand Prairie, Texas, the address where Akoto was living. Quaye also testified that the email account belonged to Akoto. And the government introduced other documentary evidence that the account belonged to Akoto, including messages in the account referring to his business, regarding airplane tickets for him and his wife, and addressing him by his nicknames. The government further established that the kwa2kg@yahoo.com account was used to correspond with two other email accounts (kwa22kg@yahoo.com and nana2kg@gmail.com) to further the conspiracy -- i.e., by sharing fullz and washed names.

Following a three-day trial, the jury convicted Akoto on all counts.

At sentencing, the district court adopted the findings and recommendations set forth in the presentence investigation report ("PSR"). It accepted that Akoto and his coconspirators had filed at least 310 fraudulent tax returns seeking $1,326,633 in refunds, of which the IRS actually paid out $551,601. Based on this intended loss amount of $1,326,633 and several other enhancements, the court calculated a total offense level of 25, resulting in a Guidelines range of 57 to 71 months plus a mandatory consecutive 24-month sentence for the aggravated identity theft charges. The court varied downward and sentenced Akoto to 70 months' imprisonment: 46 months on the conspiracy count and on each substantive wire fraud count, to be served concurrently, and 24 months on each aggravated identity theft count, to be served concurrently to each other and consecutively to the 46 months.[2]

## II.

### A.

As to Akoto's first argument on appeal, based on alleged ineffective assistance of counsel, such arguments are rarely entertained on direct appeal if not previously raised below, and

---

[2] The district court also imposed two years of supervised release, $551,601 in restitution, and a $600 assessment.

we decline to do so here.  See United States v. Miller, 911 F.3d 638, 641-42, 646 (1st Cir. 2018).

Counts Five and Six of the indictment charged Akoto with committing aggravated identity theft in violation of 18 U.S.C. § 1028A by "knowingly possess[ing] and us[ing], without lawful authority, means of identification of other people, that is, the names and Social Security Numbers of two individuals for the purpose of filing false and fraudulent United States Income Tax Returns claiming tax refunds . . . during and in relation to a . . . conspiracy to commit wire fraud."  The indictment alleged that these offenses "continu[ed] to a date uncertain, but at least as late as March 13, 2013."  The indictment also specified that the false tax returns associated with these counts were filed on November 20, 2012 (Count Five) and January 31, 2013 (Count Six).

Akoto argues that Count Five was untimely "from the face of the indictment" because the indictment was not returned until November 29, 2017, more than five years after the false tax return associated with Count Five was filed on November 20, 2012.  See 18 U.S.C. § 3282(a) (setting a five-year statute of limitations period for most noncapital offenses).  He claims that his trial counsel's failure to raise this statute of limitations defense amounted to ineffective assistance of counsel in violation of the Sixth Amendment.

- 8 -

The government responds that (1) it is premature to address Akoto's ineffective assistance claim in the present appeal, not least because further factual development is needed, and (2) should this court entertain Akoto's ineffective assistance claim, it fails on the merits for multiple reasons. The government argues that Count Five was timely for three reasons: First, the charging language in the indictment expressly alleged that the offense continued "at least as late as March 13, 2013," and the inclusion of the earlier date on which the tax return was filed should not override this charging language. Second, Count Five was timely as a continuing offense: aggravated identity theft requires the commission of a predicate felony, the statute of limitations does not begin to run until the predicate felony is completed, and the predicate felony here -- the conspiracy to commit wire fraud -- lasted well into the statute of limitations period. Third, Count Five was timely as proven at trial because the refund associated with the false tax return was not issued until December 5, 2012, within the statute of limitations period, and because Akoto continued to "possess" the stolen identity information in his email account within this period.

At the very least, the government argues, the uncertain viability of a statute of limitations defense is such that trial counsel's failure to raise it does not constitute ineffective assistance and Akoto has also not met his burden to show prejudice.

The government makes the point that Akoto faced a mandatory two-year sentence based on the other aggravated identity theft count (Count Six), which Akoto does not challenge as untimely, so trial counsel's choice to pursue an alternative defense theory which could have resulted in acquittal on all counts was reasonable.

We reach only the threshold question and decline to review the merits of Akoto's ineffective assistance claim on direct appeal. This court has "held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance of counsel cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." Tkhilaishvili, 926 F.3d at 20 (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993)). The trial court, "by reason of [its] familiarity with the case, is usually in the best position to assess both the quality of the legal representation afforded to the defendant . . . and the impact of any shortfall in that representation" in the first instance. Id. (quoting Mala, 7 F.3d at 1063). "Thus, a criminal defendant who wishes to pursue a claim of ineffective assistance not advanced in the trial court is ordinarily required to defer that claim to collateral proceedings." Miller, 911 F.3d at 642.

We have recognized a potential exception to this rule "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration"

of the claim on direct appeal.  Id. (quoting United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991)).  That exception is not applicable here.  It is by no means clear, for reasons articulated by the government, that a statute of limitations defense was obviously available to Akoto in this case.  Further factual development, which is not present in the record before us, is necessary to appraise counsel's performance.[3]  See, e.g., Tkhilaishvili, 926 F.3d at 20 (declining to review an ineffective assistance claim on direct appeal for similar reasons); Miller, 911 F.3d at 646 (same); United States v. Leahy, 473 F.3d 401, 410 (1st Cir. 2007) (same).

Akoto contends that our recent decision in Miller not to take up an ineffective assistance of counsel claim on direct appeal "turned on" the fact that counsel in that case was at least aware of a potential statute of limitations issue -- and that the absence of evidence of a similar awareness in this case is grounds to decide Akoto's claim on direct appeal.  Nothing in Miller supports that proposition.  Miller noted by way of background that counsel was aware of a potential statute of limitations issue, see 911 F.3d at 641, but that fact did not guide our analysis.  Miller's holding rested instead on the general rule that we will not resolve

---

[3]   Akoto points to certain portions of the trial transcript he claims "affirmatively show[]" that counsel was unaware of the statute of limitations defense.  Not so.

an ineffective assistance claim on direct review if the record is not sufficiently developed to allow for thoughtful consideration of the claim.  See id. at 646 ("We are left to guess at trial counsel's thought processes . . . .  When all is said and done, we know little more than that trial counsel chose not to file a motion to dismiss."); see also Leahy, 473 F.3d at 410 (declining to credit the defendant's assertion that his trial counsel was simply unaware of a key case in the absence of developed factual support for that assertion).

We thus affirm Akoto's conviction on Count Five, without prejudice to his ability to raise his claim of ineffective assistance of counsel in a collateral proceeding should he wish to do so.  See 28 U.S.C. § 2255.

**B.**

Akoto next argues that the district court constructively amended the three substantive wire fraud counts charged in the indictment (Counts Two though Four) in its jury instructions. Akoto did not object to the jury instructions in the district court, so our review is for plain error.  See United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008).  Under that standard, Akoto must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [Akoto's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v.

Valdés-Ayala, 900 F.3d 20, 36 (1st Cir. 2018) (quoting United States v. George, 841 F.3d 55, 64 (1st Cir. 2016)). We conclude that, reading the challenged instructions in context, no error occurred.

Counts Two through Four alleged, in relevant part, that Akoto and Quaye "devised and intended to devise and aided and abetted each other in devising a scheme and artifice to defraud" and, in furtherance of that scheme, "transmitted and caused to be transmitted by means of wire communications, as more particularly described below, in interstate and foreign commerce, certain writings."  The three counts were specifically charged as follows:

| Count Number | Description of Wire | Location of Wire | Date of Wire |
|---|---|---|---|
| Two | AKOTO e-mail sent to monitored e-mail account requesting 200 MOI | Sent to District of New Hampshire | February 14, 2013 |
| Three | AKOTO e-mail sent to monitored e-mail account requesting MOI "that wld pass" | Sent to District of New Hampshire | February 16, 2013 |
| Four | AKOTO e-mail sent to monitored account requesting "new info that is almost 9 or 6 months old." | Sent to District of New Hampshire | February 19, 2013 |

In the jury instructions, the district court defined the term "interstate wire communication," in relevant part, as follows:

> An "interstate wire communication" includes a telephone communication from one state to another, as well as an email transmission or

- 13 -

other internet communication. It also includes the electronic filing of a tax return with the Internal Revenue Service from one state to another.

The district court also instructed the jury on aider and abettor liability as to Counts Two through Four.

Akoto argues that the instruction that an interstate wire communication includes "the electronic filing of a tax return," given in conjunction with the aiding and abetting instruction, "permitted the jury to convict [Akoto on Counts Two through Four] upon a finding that he aided and abetted any co-conspirator in electronically filing any tax return despite the fact that those counts were expressly premised on specific emails." (Emphasis omitted.) He contends that this amounted to an impermissible constructive amendment to the indictment.[4]

"A constructive amendment occurs when the charging terms of an indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." Brandao, 539 F.3d at 57 (quoting United States v. Pierre, 484 F.3d 75, 81 (1st Cir. 2007)). "The prohibition on constructive amendment exists to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect

---

[4] In his reply brief, Akoto disclaims any separate challenge based on the aiding and abetting instruction.

- 14 -

the defendant's Sixth Amendment right to be informed of the charges against him." Id. In assessing whether a district court's jury instructions constructively amended the indictment, we evaluate the challenged instructions not in isolation but in the context of the entire charge. See United States v. McBride, 962 F.3d 25, 33 (1st Cir. 2020); United States v. Lopez-Cotto, 884 F.3d 1, 9-11 (1st Cir. 2018).

Taken in context, the district court's definition of "interstate wire communication" did not constructively amend the indictment and did not amount to error, let alone plain error.

The district court began by instructing the jurors that they "should not single out any one instruction, but instead apply these instructions as a whole to the evidence in the case." Turning to the substantive instructions, the district court told the jury that it would explain "the elements of the substantive crime of wire fraud" before explaining conspiracy, "because [the conspiracy] instructions will be better understood if the substantive counts have been explained first." The district court then explained that Counts Two through Four "allege that [Akoto] . . . devised and intended to devise, and aided and abetted another in devising, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises" and "[i]n furtherance of, and for the purpose of executing such schemes and artifice to

- 15 -

defraud . . . transmitted and caused to be transmitted by means of wire communications, as more particularly described below, in interstate and foreign commerce, certain writings." The district court then read the description of the three specific emails charged for Counts Two through Four verbatim from the indictment.

The district court then provided definitions. The district court defined terms such as "scheme," "defraud," and aider and abettor liability. The district court also provided the definition of "interstate wire communication" discussed above.

The district court went on to explain Count One, conspiracy to commit wire fraud. The court referred the jury back to its earlier discussion of wire fraud before turning to the conspiracy-specific elements of the count: "As I instructed you earlier, section 1343 of Title 18 makes it unlawful to commit wire fraud and provides that . . . ." The court provided definitions for terms like "conspiracy" and "overt act," but did not repeat the substantive wire fraud definitions it had previously given, including the definition of "interstate wire communication."

The district court defined the substantive elements of wire fraud only once and had the jury use that definition for both the substantive wire fraud counts and the conspiracy to commit wire fraud count. The court sensibly noted that the filing of a tax return could be a wire communication, because Count One alleged that such filings were overt acts in furtherance of the conspiracy.

This definition did not shift the theory of the case as to Counts Two through Four. Indeed, the jury instructions on those counts described the specific email which served as the basis for each count.

The challenged jury instruction did not constructively amend the indictment and was not error, let alone plain error. See McBride, 962 F.3d at 33 (rejecting constructive amendment challenge after reviewing jury instructions as a whole); Lopez-Cotto, 884 F.3d at 10-11 (same).

## C.

Akoto's final contention on appeal is that the district court erred in calculating the loss amount attributable to his conduct during sentencing. Akoto makes two arguments. First, he asserts that there is not sufficient evidence connecting him to the 310 fraudulent tax returns on which the district court based its loss calculations. He argues that the fact that PII used in these fraudulent returns was found in the conspiracy's email accounts is insufficient, because other fraudsters may have had access to this same PII.[5] Second, Akoto contends that the district court should have used the same loss amount for him as for Quaye, which would have resulted in a 12-level (rather than 14-level)

---

[5] Akoto points to the facts that Ngo sold PII to at least 1,300 individuals around the world, that Ngo often resold the same fullz to multiple individuals, and that at least 13,673 fraudulent tax returns were filed using information from the fullz.

increase in his total offense level and potentially a shorter sentence.

"'In a fraud case resulting in financial loss, the defendant's guideline sentencing range is determined in part' by the amount of loss." United States v. Flete-Garcia, 925 F.3d 17, 28 (1st Cir. 2019) (quoting United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018)). The loss amount "is the greater of actual loss or intended loss," with intended loss being "the pecuniary harm that the defendant purposely sought to inflict." USSG § 2B1.1 cmt. n.3(A). "Since intended loss normally subsumes actual loss, intended loss is often the greater of the two." Flete-Garcia, 925 F.3d at 28.

District courts have "considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss." Id. And a district court's loss calculations "need not be precise: the sentencing court need only make a reasonable estimate of the range of loss." Id.; accord USSG § 2B1.1 cmt. n.3(C). For example, a district court can estimate loss by looking to factors like "[t]he approximate number of victims multiplied by the average loss to each victim" and "the scope and duration of the offense." USSG § 2B1.1 cmt. n.3(C).

The government bears the burden of proving the loss amount by a preponderance of the evidence. Flete-Garcia, 925 F.3d

at 28.  We review the district court's factual findings as to the loss amount for clear error.  Id. at 26, 32-33.

Here, the district court accepted the government's submission that Akoto and his coconspirators had filed at least 310 fraudulent tax returns seeking $1,326,633 in refunds, $551,601 of which was paid out.  The government reached these figures through a multistep process.  First, the IRS examined emails in three email accounts that the trial evidence established were used in the conspiracy (kwa2kg@yahoo.com, kwa22kg@yahoo.com, and nana2kg@gmail.com).[6]  The IRS flagged any PII found in these emails, and then determined whether this PII had been used in tax returns.  If so, the IRS took further steps to identify whether these tax returns were in fact fraudulent, such as by comparing the wage information reported on the return with wage information reported to the IRS by employers.  This process identified the 310 fraudulent returns that utilized PII found in the email accounts used in the conspiracy.[7]  The government provided Akoto with a list

---

[6]     There was evidence that the second two accounts were also controlled by Akoto.  For example, Quaye testified that nana2kg@gmail.com was one of Akoto's accounts (in addition to kwa2kg@yahoo.com), and that Akoto identified himself by placing "2kg" in the usernames of his accounts.  The government did not seek to directly establish Akoto's control over the second two accounts, presumably because the evidence showed that he controlled the first account and that, at the least, the second two accounts were used by coconspirators to further the conspiracy.

[7]     The IRS initially identified at least 490 fraudulent tax returns that utilized PII found in these email accounts, amounting to $2,363,349 in requested refunds and $665,728 in paid refunds.

of these 310 returns, including the tax return ID number, the names and Social Security numbers used, the tax year, the bank information used, the refund amount requested, and the refund amount paid. The total refund amount fraudulently requested was $1,326,633, and the total refund amount paid was $551,601. Akoto did not challenge any of these specific fraudulent returns as not being associated with the conspiracy.

Based on these figures, the district court determined that the intended loss, and thus the amount of loss, was $1,326,633. Because this loss amount was over $550,000, it resulted in a 14-level increase in Akoto's total offense level. See USSG § 2B1.1(b)(1).

As to Akoto's first challenge, we conclude that the district court did not clearly err in determining that the 310 fraudulent returns were tied to Akoto and his coconspirators by a preponderance of the evidence.

Each of the 310 returns at issue utilized PII found in the conspiracy's email accounts. And the methodology the government used to identify these 310 returns was virtually identical to that which we approved in Flete-Garcia.[8] In that

_____

However, after further consideration the government opted for a more conservative loss amount figure based on the 310 tax returns.

[8] We focus on Flete-Garcia's treatment of the $5 million in intended loss resulting from tax returns that the conspirators in that case filed but which were rejected by the IRS. See 925 F.3d at 31-33. The government was able to substantiate the $7.7

case, as here, the government took PII possessed by the conspirators, identified tax returns that utilized this information, determined whether the returns were in fact fraudulent, then prepared summary charts cataloging the losses. See id. at 31-32. In affirming the district court's loss calculation, we emphasized the fact that "the record shows with conspicuous clarity that the IRS used the PII" possessed by the coconspirators "to identify the suspect tax returns." Id. at 32.

The fact that unrelated fraudsters may also have possessed some of this PII does not render the loss amount clearly erroneous so long as there is sufficient evidence tying Akoto to the loss. Indeed, Akoto concedes that the government did not have to "eliminate the possibility" that an unrelated culprit filed some of the fraudulent returns at issue. Flete-Garcia is again instructive. There, we held that the district court did not clearly err in accepting a $5 million intended loss figure even though one of the defendant's coconspirators had "admitted to doing some 'freelancing,'" including by selling lists of PII to others, and certain tax returns in the government's summary charts could

---

million actual loss figure in Flete-Garcia by reviewing the conspirators' bank accounts for evidence of tax-refund checks. Id. at 29. Such an approach to actual loss was not viable in this case because Akoto and his coconspirators structured their scheme to conceal receipt of the proceeds (by routing the refunds to prepaid debit cards in others' names and then making withdrawals in cash).

be read to have been filed by individuals outside of the defendant's conspiracy. Id. (noting Flete-Garcia's argument that the addresses and W-2 forms associated with some returns pointed toward other culprits). We reasoned that "the [district] court reasonably credited the government's explanation that [the freelancer's] separate activities were not included in the loss calculation" and that, viewing the record as a whole, there was no clear error. Id.; see id. at 32-33. The mere possibility that others possessed the PII at issue was not dispositive.

So too here. The fact that the conspiracy possessed the PII used in the fraudulent returns is itself strong evidence of culpability. See United States v. Clayton, 108 F.3d 1114, 1118-19 (9th Cir. 1997) (holding that the fact that the defendant possessed 29 stolen phone ID numbers and had illegally cloned at least two of them "support[ed] the district court's inference that he was responsible for the loss associated with the remaining stolen numbers found in his possession"). And there was also additional evidence beyond this fact of possession which tied Akoto and his coconspirators to the fraudulent returns.

To begin, Akoto overstates the potential for overlap between the PII found in the conspiracy's email accounts and PII possessed by unrelated fraudsters. Ngo sold PII to individuals around the world and often resold the same fullz. But Ngo maintained a total inventory of more than 176,000 fullz; not all

of his clients necessarily possessed the fullz found in the conspiracy's email accounts, which constituted a tiny fraction of Ngo's total inventory. And Ngo sold fullz between 2007 and 2013, whereas Akoto was charged based on conduct between 2011 and 2013. All 310 of the fraudulent tax returns at issue were for tax years 2010 through 2012 (corresponding to calendar years 2011 to 2013), the time period when Akoto and his coconspirators were actively filing such returns.

Further, Akoto's practice was to specifically request new information that would work for the scheme. He asked Ngo for "fresh one[s] that no one has" and "the newest info that you have." In November 2011, he asked for information "for 2011." In April 2012, he asked for "2011 and 2012, if possible." His goal was to obtain information that "would pass" for purposes of the fraud. Ngo testified that Akoto wanted to purchase "up-to-date," newer information, and that newer fullz were less likely to have been sold to many other purchasers. And Agent O'Neill testified that, in the context of this investigation, he understood "fresh ones" to mean "PII that ha[d] been recently stolen or acquired and not sold to anyone else." Fullz that had already been used by other fraudsters would not work for purposes of Akoto's fraud scheme, so he specifically requested newer fullz that "would pass."

We add a final point. As in Flete-Garcia, the district court here "was operating with a substantial cushion." 925 F.3d

at 32.  The court found that the amount of loss was $1,326,633.

Any loss amount above $550,000 would have led to the same 14-level

increase in Akoto's offense level.  See USSG § 2B1.1(b)(1).  So to

demonstrate reversible error, Akoto must convince us that roughly

$775,000 -- or almost sixty percent of the loss amount attributed

to him by the district court -- was the product of clear error.

See Flete-Garcia, 925 F.3d at 32.  He has not done so.[9]

---

[9]     Akoto directs our attention to United States v. Cabrera, 172 F.3d 1287 (11th Cir. 1999), a case in which the defendant was prosecuted for knowingly possessing telephone cloning equipment. Id. at 1289.  At sentencing, the government offered a loss amount based on the electronic serial number/mobile identification number ("ESN/MIN") combinations found in Cabrera's possession.  Id. at 1290-91.  The Eleventh Circuit rejected this approach.  Reasoning that "[m]ultiple unauthorized users often use the same ESN/MIN combinations simultaneously" and "sellers provide the same ESN/MIN combinations to multiple buyers," the Eleventh Circuit held that, to attribute telephone cloning fraud loss to a defendant, the government must "provide evidence specifically linking the amount of fraud loss to the defendant's cloning activities."  Id. at 1292; see also id. 1293-94.

It is first worth noting that the Ninth Circuit reached the opposite conclusion as Cabrera on similar facts.  See Clayton, 108 F.3d at 1118-19.  In addition, our case is distinct from Cabrera in an important way: while in Cabrera, the government's loss amount was based on ESN/MIN combinations that it found "on Cabrera's handwritten list," "computer" and "computer disks," 172 F.3d at 1293, here, the government's loss amount is based exclusively on PII that Akoto exchanged by email, often with coconspirators.  It is fair to presume, then, that Akoto intended this PII to be used in the scheme, and therefore "intended" the "loss" that would result from its successful use.  See also Flete-Garcia, 925 F.3d at 31 (approving intended loss amount based on PII that defendant "gave" to coconspirator).  Thus, even if we were to agree with Akoto that the government did not sufficiently tie him to the fraudulent returns to support its "actual loss" calculation, the government has certainly done enough to support its "intended loss" calculation, which is sufficient to establish the "loss amount" for the purposes of sentencing.  See USSG § 2B1.1

As to Akoto's second argument, we conclude that the district court did not clearly err by declining to adopt Quaye's $364,758 loss amount as the loss amount attributable to Akoto. The government calculated the loss attributable to each defendant using the same multi-step methodology. The difference was that the universe of emails associated with Akoto was simply broader. For Quaye, the government limited its review to emails exchanged between Quaye's email address and Akoto's email address, whereas for Akoto, the government reviewed emails in his kwa2kg@yahoo.com account and in the two other accounts he corresponded with to advance the conspiracy (accounts with which Quaye did not correspond). And the government persuasively contends that this difference in scope reflects Akoto's deeper involvement in the conspiracy -- as evidenced by, for example, his initial recruitment of Quaye into the scheme and his more extensive connections with coconspirators.

## III.

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.

---

cmt. n.3(A) ("[L]oss is the greater of actual loss or intended loss.").