# United States Court of Appeals
## For the First Circuit

No. 23-1032

UNITED STATES,

Appellee,

v.

CHRISTOPHER N. CONDRON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Montecalvo, Thompson, and Rikelman,
Circuit Judges.

Eamonn R. C. Hart, with whom Brann & Isaacson was on brief,
for appellant.

Alexia R. De Vincentis, Assistant United States Attorney,
with whom Joshua S. Levy, Acting United States Attorney, was on
brief, for appellee.

March 28, 2024

**RIKELMAN**, <u>Circuit Judge</u>. After a fourteen-day trial, a jury convicted Christopher Condron of wire fraud and conspiracy to defraud the United States by obtaining payment for false claims. On appeal, Condron argues that the district court erred in denying his motion for a judgment of acquittal because: (1) there was insufficient evidence as to each count to support his conviction; and (2) the government's argument and evidence at trial constructively amended, or at least prejudicially varied from, one of the wire fraud counts. Additionally, he contends that the district court abused its discretion when it limited his cross-examination of a key government witness. After careful consideration of the trial record, we affirm the verdict and Condron's conviction.

## I. BACKGROUND

This case centers on Condron's role in submitting applications to the United States Department of the Treasury ("Treasury") for grant money in connection with purported renewable energy projects. The facts here are complicated, and to put them in context, we begin with an overview of the federal grant program at issue.

### A. The Section 1603 Grant Program

In 2009, Congress enacted section 1603 of the American Recovery and Reinvestment Act ("Section 1603") to encourage investments in clean, renewable energy projects. <u>See generally</u>

- 2 -

Pub. L. No. 111-5, § 1603, 123 Stat. 115, 364 (2009). Section 1603 provides for cash grants, in lieu of otherwise available tax credits, to entities that "place[d] in service specified energy property" within a certain timeframe, id. § 1603(a), including small wind energy, trash, and open-loop biomass facilities.[1]

Treasury contracted with the National Renewable Energy Laboratory ("NREL"), "a government-funded research and development organization that specializes in renewable energy," to review Section 1603 grant applications.[2] In turn, NREL created and managed an online portal through which grant-seekers could submit an application, upload any supporting documents, and respond to any subsequent requests from NREL seeking additional information.

Under the Section 1603 program, there were two types of applications: (1) a "placed in service" application; and (2) a "placeholder" application, also known as a "start of construction" application. A grant-seeker could submit a placed-in-service application if the property had been "placed in service" at the time of the application, meaning it was "ready and available for

---

[1] Open-loop biomass facilities use "cellulosic waste" material (i.e., plant-derived material like tree bark or sawdust) and/or livestock waste material (e.g., manure) to generate electricity.

[2] During all relevant times here, Treasury did not conduct its "own independent review of [an] application aside from NREL's" review.

- 3 -

its specific use."[3] A placeholder application, by contrast, was available for a grant-seeker that had begun construction on a renewable energy project in 2009, 2010, or 2011 that would not "be placed in service until beyond 2011."

When submitting a placed-in-service application, a grant-seeker would submit a commissioning report, which was "[a] report provided by the project engineer, . . . equipment vendor, or an independent third party that certifie[d] that the equipment ha[d] been installed, tested, and [was] ready and capable of being used for its intended purpose." Treasury also required "documentation to support the cost basis claimed for the property," including "a detailed breakdown of all costs included in the basis." The cost basis was generally the amount that the grant-seeker spent on the property, including "installation costs and the cost for freight incurred in construction of the . . . property." If the grant-seeker claimed a cost basis that was more than $500,000, Treasury required that it submit "an independent accountant's certification attesting to the accuracy of all costs claimed as part of the basis of the property."

After reviewing a placed-in-service application, NREL would provide Treasury with a report recommending that the

_____

[3] A grant-seeker could submit a "placed in service" application if its property was placed in service in 2009, 2010, or 2011.

application be approved (for a certain amount) or denied. For those applications that it recommended approval, NREL would assign a grant award that was up to 30 percent of the cost basis of the property. For example, if the cost basis was $100,000, NREL would assign a grant award of up to $30,000. Once NREL recommended that a particular application be approved, Treasury would then initiate payment to the grant-seeker via a wire transfer.

Importantly, placeholder applications, or start-of-construction applications, did not provide an option to request a grant payment. The purpose of a placeholder application was to allow a grant-seeker whose property was not yet complete to later request grant funds once the property was placed in service. A grant-seeker submitting a placeholder application was required to demonstrate via "[p]aid invoices and/or other financial documents . . . that physical work of a significant nature ha[d] begun on the property." Placeholder applications were required to be submitted by October 1, 2012, and only after construction began.

NREL assigned a unique number to each application submitted on its online platform.

## B. The Indictment

On August 9, 2017, Condron and Jessica Metivier -- his then-girlfriend and the mother of his children -- were indicted on one count of conspiracy to defraud the United States with respect to claims in violation of 18 U.S.C § 286 (Count One) and three

- 5 -

counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Two - Four).

With respect to the conspiracy charge, the indictment alleged that Condron and Metivier conspired to defraud the United States "by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims for monetary grants under Section 1603." It further alleged that Condron and Metivier hired a Massachusetts-based attorney to submit applications "to Treasury seeking more than $50 million in Section 1603 grants on behalf of [four] companies that the [a]ttorney created for M[etivier]:" Acton Bio Energy, LLC ("ABE"); Concord Nurseries, LLC; Kansas Green Energy, LLC ("KGE"); and Ocean Wave Energy, LLC ("OWE").

To support the wire fraud charges, the indictment alleged that Condron and Metivier submitted or caused to be submitted online to Treasury certain fraudulent information. The alleged wires underlying each count were as follows:

| Count | Approximate Date/Time | Wire |
|-------|----------------------|------|
| 2. | September 28, 2012 | Section 1603 grant application number 2012E48WE214854 submitted online to Treasury on behalf of OWE for $25,204,770, regarding "small wind energy property." |
| 3. | January 11, 2013 | Response, submitted online to Treasury, to a January 7, 2013 request for information from NREL about background and qualifications of Person A. |

| 4. | April 17, 2013 | Response, submitted online to Treasury, to a March 27, 2013 request for information from NREL about Person A's role in the OWE wind farm project. |
|---|---|---|

Condron proceeded to trial in September 2021.[4]

### C. The Evidence[5]

The trial evidence focused on Condron's role in submitting Section 1603 applications and related information to NREL between 2009 and 2013 for ABE, Concord Nurseries, KGE, and OWE. As we detail below, Condron directed an attorney to create these entities and then submit applications and other documents on behalf of the entities to the Section 1603 program, even though Condron was not listed as the applicant or as a manager or principal on the entities' formation documents.

### 1. Acton Bio Energy, LLC

In 2009, Condron approached Richard Colman, a Massachusetts attorney and financial planner, about applying to the Section 1603 program. Colman, who had no prior experience with Section 1603, ultimately agreed to help Condron apply for a

---

[4] Metivier did not proceed to trial with Condron, as she pleaded guilty to a superseding information that the government filed against her in September 2020. On the government's motion, the district court dismissed all counts of the indictment against her.

[5] We recount the relevant evidence "in the light most favorable to the jury's verdict, consistent with record support." United States v. Katana, 93 F.4th 521, 525 (1st Cir. 2024) (citation omitted).

grant in connection with an open-loop biomass gasification facility.[6] Colman understood his role to be limited to "fill[ing] out the forms" and submitting them online to Treasury on behalf of the project. He worked on the application (and additional ones that followed) on a contingency fee basis, such that he would be paid if and when Treasury approved the grant.

The first application Condron and Colman worked on together was for a "turnkey operation," which Condron explained to Colman was a project that was fully ready to operate upon sale to the buyer. Condron informed Colman that he wanted to arrange a transaction in which his company, "C2C," would sell and finance a biomass gasifier to an entity created under Metivier's name. Per Condron's instructions, Colman filed a certificate of organization to create ABE and listed Metivier as its manager.

Colman expressed concerns about Metivier "tak[ing] on so much debt" in the transaction, given her limited resources at the time and her lack of knowledge about gasification or biomass technology. He spoke with her about his reservations, but she decided to move forward with the sale. Under the terms of the transaction, "C2C Inc." sold the gasification system to ABE for $2,935,000 and lent approximately $2.7 million to ABE to finance

---

[6] A biomass "gasification system" converts biomass into a synthetical natural gas, cools the gas and cleans it of contaminants, and then uses the resultant gas as fuel to generate electricity or heat.

the transaction. Metivier signed a bill of sale (along with Condron) and a promissory note in connection with the transaction.[7]

On December 17, 2009, Colman submitted a Section 1603 application for ABE at Condron's direction. He also submitted several supporting documents, a few of which we describe below.

One document was an independent auditor's report. To certify the project costs listed in the application, Metivier hired Diane Lambert, a CPA with Walsh & Associates, to prepare an independent accountant's report. She supplied Lambert with the relevant information for the report, including a breakdown of the cost amounts, the bill of sale, the promissory note, and invoices. Because Lambert was not conducting a "full-blown audit," she did not independently verify the costs of the property and relied on Metivier to provide accurate cost information. Based on the information Metivier provided, Walsh & Associates concluded in its final report that "[t]he eligible cost basis for the . . . [g]asifi[cation] . . . [s]ystem of Acton Bio Energy LLC in the amount of $2,935,000 ha[d] been determined in accordance with the general rules for determining the basis of property for federal income tax purposes and [was] accurate."

---

[7] Colman testified that he prepared the bill of sale and promissory note based on terms and numbers that Condron provided. According to the promissory note, ABE would pay approximately $16,000 a month to C2C to repay the loan.

Colman also submitted a power purchase agreement between ABE and Acton Sand & Gravel, a "gravel pit operation . . . that crushe[d] stone and other materials for use in construction." Metivier signed on behalf of ABE as its managing member. Under the terms of the agreement, ABE would install a biomass gasification system at Acton Sand & Gravel and then sell and deliver electricity produced by the system to Acton Sand & Gravel.

Other documentation submitted in support of the ABE application included: a certification (signed by Condron and Metivier in July 2009) that the gasification system had been "successfully tested" and was "ready for and . . . capable of operation"; a certification from "C2C Solutions,"[8] signed by Condron, that the biomass gasification system had been installed and re-tested at the operating site (Acton Sand & Gravel) in September 2009; and a limited power of attorney signed by Metivier, authorizing Colman to prepare and submit all documents necessary to prepare and file the Section 1603 application on ABE's behalf.

In the spring of 2010, Treasury granted the ABE application and awarded approximately $700,000. Colman sent Metivier an invoice for his work on the application and received $24,000 as his contingency fee.

---

[8] An IRS agent testified at trial that he was never able to locate a company by the name of "C2C Solutions."

## 2. Concord Nurseries, LLC

In 2010, Condron and Colman began working on a placed-in-service application for another open-loop biomass facility. This application was on behalf of Concord Nurseries, which Colman formed (per Condron's instructions) by filing a certificate of organization that named Metivier as its only principal. The idea behind the Concord Nurseries project was to connect a biomass gasifier to several generators that would power greenhouses at the company's place of business. As before, Condron provided Colman with the information necessary to prepare the application and supporting documents, including a breakdown of the project costs. And Metivier again signed a limited power of attorney authorizing Colman to prepare and submit the Section 1603 application on behalf of Concord Nurseries.

In connection with this project, Condron arranged for his mother, Shirley Brewer, to purportedly sell the gasification equipment (another "turnkey operation") to Concord Nurseries for $26,773,178.55. Under the terms of the transaction, Metivier ultimately put down only a $26,773.18 deposit and Brewer, doing business as The Emerald Group (an entity that Colman created at Condron's behest, listing Brewer as its principal), financed the remainder. Metivier signed a promissory note obligating her to make installment payments over a term of 20 years to repay the loan.

Condron told Colman that Brewer "had a background in solar energy," and Colman's understanding from Condron was that she "knew about alternat[ive] energy projects." In reality, however, Brewer never studied "anything related to energy, including biomass or solar," and had no formal education in energy or engineering. Instead, she had degrees in human services management, business administration, and nursing, and she had worked as a nurse manager for twenty years until 2011. Further, Brewer's experience with energy equipment prior to her involvement in The Emerald Group was limited to buying and installing a wood-burning furnace with her then-husband for their home in the late 1970s and familiarizing herself with a thermal solar system that he built around the same time; she had no experience testing a biomass system to determine its operability (aside from "read[ing] certain articles about it").

As with the ABE project, Metivier worked with Lambert to prepare an independent auditor's report for the Concord Nurseries application. Metivier supplied Lambert with a bill of sale that she signed on behalf of Concord Nurseries (and which Brewer signed "d/b/a the Emerald Group"),[9] the promissory note she signed, and invoices. Lambert compiled the schedule of costs listed in the independent auditor's report based on these documents.

_____

[9] Colman prepared the bill of sale based on information that Condron provided.

Colman filed the application for Concord Nurseries on April 29, 2011. According to the application, the gasification system had been placed in service on November 15, 2010, and the cost basis of the property was $26,787,532. As supporting documentation, Colman included Lambert's independent auditor's report; a bill of sale for the transaction between Metivier and Brewer; and a commissioning report, signed by Brewer and dated November 15, 2010, certifying that "[t]he biomass energy producing system purchased by Concord Nurseries ha[d] been installed at [its operating site] . . . and tested on November 15, 2010 [and] as a result the equipment [was] ready and capable of operation." The application for Concord Nurseries requested, and Treasury ultimately awarded, a grant of $8,036,260. Colman sent Metivier an invoice for his work and received approximately $360,000 as his contingency fee.

### 3. Kansas Green Energy, LLC

Later in 2011, Condron and Colman began work on an application for KGE, which Colman formed by filing a certificate of organization that listed Metivier as its principal. In the underlying transaction that Condron arranged, Industrial Supplies, LLC -- another entity that Colman formed, listing Brewer as its principal -- purportedly sold a turnkey operation to KGE for

approximately $58 million.[10]  The operation supposedly involved a trash facility that would use "municipal solid waste to produce electricity" that would light, and provide heat for, greenhouses.[11] Metivier signed a promissory note in connection with the transaction.  She also signed a limited power of attorney authorizing Colman to prepare and submit the Section 1603 application on behalf of KGE.

On July 10, 2012, based on information provided by Condron, Colman filed KGE's placed-in-service application.  The supporting documents that Colman submitted included:  an independent auditor's report that Lambert prepared largely based on information from Metivier; and a commissioning report from Industrial Supplies, signed by Brewer, stating that "final testing and commissioning" indicated that the system was "ready and capable of being used for its intended purpose."  The placed-in-service date of the trash facility was allegedly December 30, 2011.  The application listed the qualified cost basis as $58,805,237 and requested a grant between $17 and $18 million.

---

[10] Industrial Supplies also financed the transaction, but it is unclear for what amount.

[11] The distinction between trash facilities and open-loop biomass facilities is the source of fuel: trash facilities use municipal solid waste, whereas open-loop biomass facilities use cellulosic and/or livestock waste material.

In early September 2012, NREL requested additional information and documentation for the KGE project. Because NREL did not receive timely answers to its requests, it denied the application. On September 25, 2012, Colman filed a second application for KGE with supporting documents. This second application listed the qualified cost basis as $58,701,305 and requested a grant of $17,610,392.

Donald Edward Settle, "a senior adviser in project development finance" who led NREL's due diligence team for the Section 1603 program, eventually took the lead in reviewing the KGE applications. On January 7, 2013, Settle asked Colman for "current contact information" for several individuals, including Brewer, and for a description of "the relationship, past and present, between [such] individuals and with the owners of KGE and Concord Nurseries." On January 11, 2013, Colman submitted through the NREL online portal a response to this request. Based on information from Condron, Colman described Brewer as: "Owner of Industrial Supplies, LLC and is the contractor who sold turnkey operation to KGE. She also sold [t]urnkey operation to Concord Nurseries. Ms. Brewer has been [i]nvolved with alternative energy since the late 70's[,] specializing in thermal solar and biomass."[12]

---

[12] This response was the basis for Count Three.

Settle ultimately recommended that Treasury reject the KGE application because he could not determine that it was placed in service and there was insufficient documentation to support the claimed cost basis of the project.

**4. Ocean Wave Energy, LLC**

While Condron and Colman worked on the KGE project, they also worked on a project that involved "putting wind turbines on barges" to generate energy. Unlike the prior projects, this one was not yet completed (but "was started within the time that it could get funded").

In November 2011, Condron met with Carlos Peña, who specializes in waterfront engineering and who worked for CLE Engineering ("CLE"). Condron explained that he wanted "to use [offshore] barges with mounted turbines . . . moored to the ocean bottom" to generate energy. The following month, Condron told Peña "that there were two barges in Hyannis," Massachusetts and asked CLE to prepare written reports confirming whether the two barges were actually there. Also around this time, Condron or Brewer purchased about 32,000 Wi-Fi dongles ("essentially, thumb drives") for the project and stored them at three of CLE's offices. Peña ultimately sent Condron three reports on behalf of CLE and two other engineering firms that accompanied CLE to inspect the barges.

At some point, Industrial Supplies purportedly bought two wind turbines and a barge and also leased a barge. Condron arranged for a transaction in which Industrial Supplies then sold "each of the barges [and turbines] to Ocean Wave[]" Energy.

In late January 2012, Colman filed a certificate of organization to form OWE in connection with the wind farm project. As principals of OWE, the certificate listed Metivier and two of her and Condron's children.[13]

Over the course of several days in late September and early October of 2012, Colman submitted more than 550 grant applications, each seeking approximately the same amount, on behalf of OWE.[14] Colman submitted the first application on September 28, 478 applications on September 30, and 73 applications on October 1. All the applications, except the first one, were placeholder applications.

The first application, submitted on September 28, was a placed-in-service application numbered 2012E48WE182428 (the "2428 application"). The description of the underlying property in the application was "a small wind turbine system that charges batteries

_____

[13] Colman testified that the names of the two children were eventually removed, leaving Metivier as OWE's sole principal.

[14] It is unclear what exactly prompted this large number of submissions. Colman testified at one point that "[s]ometimes the Internet connection would fail or something would go wrong," prompting him to "redo [an application] a few times."

on a barge for engine operation, heat and lighting." According to the 2428 application, the property had been placed in service on December 31, 2011. The application listed a cost basis of $31,476 and requested a $9,443 grant. Supporting documents for this application included a commissioning report from Brewer, on behalf of Industrial Supplies, stating that Industrial Supplies was the vendor of the project equipment, that it had "installed two small wind turbines" in Hyannis, and that "said equipment was tested and . . . ready and capable of being used for its intended purpose . . . since December 31, 2011."[15]

As an example of the other OWE applications, the government focused at trial on one submitted on September 30, 2012 and numbered "2012E48WE214854" (the "4854 application"). Unlike the 2428 application, the 4854 application was a placeholder application and listed Metivier rather than Colman as the applicant. The 4854 application indicated that the underlying project was for a "small wind energy-producing property" that would be placed in service on or by December 31, 2016. The application also indicated that OWE had begun "significant work of a physical nature on the property" (as required for placeholder applications) because it had "started construction on December 29, 2011 on a

---

[15] The indictment alleged that this commissioning report was submitted in support of a placeholder application for OWE that requested a grant of $25,204,770 and claimed a cost basis of $84,015,900. This allegation therefore proved to be incorrect.

multiple energy-generating turbine project" and "[its] effort[s] resulted in the purchase and inventory of 32,500 WiFi communication defices [sic]" that "provide a communication path to each turbine necessary for installation and setup, process monitoring, and preventative maintenance." The anticipated cost basis listed was about $84 million, and the estimated request for payment was slightly more than $25 million.

Back at NREL, Settle became aware of the more than 500 applications submitted for OWE, all of which listed Brewer of Industrial Supplies as the vendor. On March 27, 2013, he asked for additional information with respect to the 2428 application, the only placed-in-service application submitted for OWE.[16] He focused a few of his requests, such as the following, on Brewer: "Ms. Shirley Brewer is apparently a key individual in Industrial Supplies, LLC and Ocean Wave Energy, LLC as her information is provided on invoices as OWNER. Please provide a complete description of Ms. Brewer's role in each company . . . ." Condron prepared for Colman the following response to Settle's question about Brewer's role: "Ms. Brewer . . . is the owner of Industrial Supplies, [LLC]. Industrial Supplies[,] LLC purchased the barge and sold the barge to OWE LLC. Ms. Brewer has no relation to OWE

---

[16] Settle later testified at trial that Brewer's role in Industrial Supplies and OWE was important for all the OWE applications because he was reviewing them all together.

LLC at all except as a vendor."[17]  Colman submitted this response on April 17, 2013.

Meanwhile, on March 29, 2013, Condron emailed Peña asking for a "ballpark price range for the steps of construction," explaining that he would himself "come up with the costing on the barge, turbines, etc."  Peña responded that same day, attaching "a preliminary construction estimate," which he noted was "[b]ased on the limited details [Peña had] of the project."  The attached spreadsheet listed an estimated total project cost of about $1.6 billion based on the assumption that the project would have 500 turbines and 500 barges.[18]  Condron did not speak with Peña about how he intended to use the estimate or about revising the estimate. However, the construction estimate that was submitted to NREL the following day, in connection with the 4854 application and under Metivier's name, projected a total cost of about $32 billion. According to this new estimate, the project would involve 1,500 barges with 1,786 turbines on each barge, for a total of 2,679,600 turbines.[19]

_____

[17] This response formed the basis for Count Four.

[18] It is unclear at what point Condron and Peña discussed implementing a wind farm with 500 turbines and 500 barges, but Peña testified that these numbers were consistent with his conversations with Condron.

[19] Relying on his training and experience as a marine engineer, Peña testified at trial that it was not feasible for each barge to

**5. The IRS Audit and Criminal Investigation**

In 2012, the Internal Revenue Service ("IRS") initiated a civil audit of ABE, Concord Nurseries, and KGE to verify that the entities had "in fact[] purchased equipment, placed it in service, and that [such equipment] was placed in service within the required period of time, 2009 to 2011."[20]  To facilitate this audit, IRS agents reviewed financial information, transaction documents, and invoices related to the entities and arranged to visit the three gasification systems in March 2013.  At the ABE site, Acton Sand & Gravel, agents did not see any type of gasification equipment.  Next, at the Concord Nurseries site, agents saw "empty greenhouses, . . . a couple of trailers, and a flatbed of some sort with wrapped items underneath it."  There were "no substantive business operations."  Finally, at the KGE site, agents "saw some greenhouses with some plantings in them, but no functioning business operations."  The following day, agents made efforts to find an office or manufacturing center related to Industrial Supplies, but all they found was a small, "largely abandoned" "storefront office."

In June 2013, IRS agents arranged to meet with Metivier at Acton Sand & Gravel to view "any and all gasification equipment

---

have 1,786 turbines and that the largest wind farm he was aware of at the time (worldwide) had several hundred turbines.

[20] The IRS did not conduct a civil audit of OWE.

- 21 -

relating to th[e] $89 million in gasification equipment placed in service across" the ABE, Concord Nurseries, and KGE entities. Condron was not present. Metivier accompanied the agents on a tour of the Acton Sand & Gravel site and "open[ed] a number of trailers," but the agents did not see any gasifiers. Nor did Metivier point the agents to any.

The IRS subsequently initiated a criminal investigation. Jonathan Wlodyka, a supervisory special agent for the criminal investigations division of the IRS, served upon Brewer a grand jury subpoena seeking documents relating to The Emerald Group and Industrial Supplies. In April 2016, Wlodyka interviewed Brewer and asked her about bills of sales, commissioning reports, and promissory notes relating to The Emerald Group and Industrial Supplies. Brewer stated that she did not sell a $26 million gasifier and that she did not enter into any loan agreements. Additionally, "[o]n at least one occasion [during the interview], she looked at a promissory note, and said it was phony." Wlodyka provided Christopher McCarten, another IRS agent, with the records that Brewer turned over.

McCarten then reviewed "Secretary of State records[,] . . . financial statements, bank account records, canceled checks, bills of sale, [and] notes on indebtedness" relating to ABE, Concord Nurseries, KGE, Condron, Metivier, and

Brewer.[21]  He aimed to identify expenses "for the purchase of energy equipment and trace the receipt of the treasury grant funds through the bank accounts."

The IRS ultimately made several determinations, including: for ABE, $16,093 was spent on project-related equipment, less than one percent of the claimed $2,935,000 cost basis; for Concord Nurseries, $177,000 was spent on project-related equipment, less than one percent of the claimed $26,787,532 basis; and, for KGE, approximately $3 million was spent on project-related equipment, less than five percent of the claimed approximately $58 million basis.  Additionally, although Metivier had signed a promissory note agreeing to pay approximately $16,000 per month (on behalf of ABE) to "C2C" to pay off C2C's approximately $2.7 million loan for a gasification system, McCarten found no records indicating that she had made any such payments.  Nor did he find "anything" that indicated ABE, Concord Nurseries, or KGE "had the wherewithal to make the payments on the [promissory] notes" that Metivier signed on behalf of these entities.  In fact, a review of tax returns filed for ABE, Concord

---

[21] McCarten did not review records for OWE.

Nurseries, and KGE revealed that "[t]here was little to no income reported on the returns for 2009, '10, and '11."[22]

The IRS also determined that from the approximately $700,000 that Treasury awarded in connection with the ABE project, $40,000 was deposited in Metivier's personal bank account and "spent on personal living expenses to pay off credit cards, restaurants, gas, [and] vehicle payments." Further, from the approximately $8 million that Treasury awarded in connection with the Concord Nurseries project, $950,000 was deposited in Metivier's "personal business" bank account.

Condron and Metivier were ultimately arrested in August 2017.

### D. The Government's Motion in Limine Regarding Cross-Examination of Richard Colman

On September 14, 2021, the fifth day of trial, the government filed a motion in limine seeking to prevent Condron from "cross-examining Colman about purported ethical breaches or suggesting that Colman violated any" of the Massachusetts Rules of Professional Conduct ("MRPC"). The government argued that the MRPC did "not apply because Colman was not acting as an attorney and was not providing legal services to" Condron. Even if the MRPC did apply, the government added, any allegation by Condron

---

[22] For example, ABE reported income during only one of those years, for approximately $14,000, and Concord Nurseries filed returns in 2010 and 2011 reporting no income.

"that Colman violated ethics rules [would] be more prejudicial than probative," because there was no evidence that Colman engaged in misconduct or that he charged an illegal or excessive fee.

The following morning, the district court permitted Condron to respond to the government's motion. Condron disputed the government's claim that Colman was not acting as a lawyer and argued that cross-examining Colman about the MRPC, which reflect the public's "expectations placed upon lawyers," would allow Condron to demonstrate his own "state of mind" and that he had relied on such expectations in "good faith." He also explained that he intended to cross-examine Colman about his contingency fees and about "Rule 1.4 concerning communication to the client and candor."

The district court granted the government's motion. It ruled that allowing Condron to "bring[] in the Rules of Professional Conduct [would], essentially, creat[e] a mini trial about whether someone violates the Rules of Professional Conduct," which "would be a question for the Bar, not for this case." However, the court made clear that Condron could question Colman about: whether he "was serving in his attorney capacity or in his business-advising capacity"; whether he charged "an appropriate fee for" the work he performed; and what he thought Condron "understood about [their] relationship based on their interactions and their communications."

Condron preserved his objection to the court's ruling.

**E. The Jury Verdict and Condron's Motions for Acquittal**

At the conclusion of the government's case, Condron filed a motion for a judgment of acquittal on Count Four, pursuant to Federal Rule of Criminal Procedure 29(a).[23] The district court took the motion under advisement.

The jury ultimately found Condron guilty on all four counts of the indictment. Two weeks later, on October 12, 2021, Condron filed a motion for a judgment of acquittal or, in the alternative, a new trial. He argued that there was insufficient evidence to support his convictions and that the evidence at trial "fatally varied" from the alleged facts in the indictment with respect to Counts Two and Four. In May 2022, after subsequent briefing by the parties, the court denied both of Condron's motions for acquittal, including his request for a new trial.

This timely appeal followed.

## II. DISCUSSION

Condron presents three main arguments on appeal: (1) the government presented insufficient evidence at trial to sustain his conviction as to any of the four counts; (2) the government's argument and evidence at trial constructively amended, or at least prejudicially varied from, Count Two of the indictment; and (3)

---

[23] Condron also orally moved for a judgment of acquittal on all counts.

the district court's limitation on the cross-examination of Colman undermined Condron's defense. We address each of these points in turn.

## A. Sufficiency of the Evidence

We review Condron's preserved sufficiency of the evidence claim de novo. See United States v. Daniells, 79 F.4th 57, 71 (1st Cir. 2023). In evaluating this claim, we review "the evidence in the light most favorable to the government, draw all reasonable inferences [in the government's favor], and ask whether a rational jury could find that the government proved all the elements of the offense beyond a reasonable doubt." United States v. Katana, 93 F.4th 521, 538 (1st Cir. 2024) (alteration in original) (quoting United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021)). To uphold Condron's conviction, we "need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy [ourselves] that the guilty verdict finds support in a plausible rendition of the record." Fuentes-Lopez, 994 F.3d at 71 (quoting United States v. Sabean, 885 F.3d 27, 46 (1st Cir. 2018)).

## 1. The Conspiracy Count

Count One, which charged a violation of 18 U.S.C. § 286, alleged that Condron and Metivier conspired to defraud the United States by "obtain[ing] government funds through false and fraudulent applications to the Section 1603 grant program" for

ABE, Concord Nurseries, KGE, and OWE. Condron's challenge to the sufficiency of the evidence with respect to Count One is narrow. He argues that the government's evidence failed to prove that Metivier had the requisite mens rea to defraud the United States and, therefore, the conspiracy charge against him fails because he could not conspire with himself. Relatedly, he maintains that the district court "misstated the law as to the mens rea requirement for co-conspirators" when it concluded that "[t]he government did not need to prove Metivier's state of mind."[24] The government acknowledges that a conviction on Count One "required proof that Metivier shared in [Condron's] criminal objective" but argues that the evidence was sufficient to show that she did.

We conclude that there was sufficient evidence about Metivier's state of mind to support the conspiracy charge.[25] The evidence established the following:

- Metivier was the listed principal or manager of each of the companies for which Colman submitted Section 1603 applications;

---

[24] In a footnote in his opening brief, Condron also briefly argues that, "[b]ecause of the complete lack of evidence establishing Metivier's role as a co-conspirator," the district court erred in admitting "certain out-of-court statements [by Metivier] on the co-conspirator hearsay exception under Fed. R. Evid. 801(d)(2)(e)." Condron's failure to develop this argument beyond one sentence waives it. See United States v. Boudreau, 58 F.4th 26, 32 (1st Cir.), cert. denied, 144 S. Ct. 229 (2023).

[25] Because Condron does not contest whether the government met its burden with respect to other elements of 18 U.S.C. § 286, we do not discuss those other elements here.

- she signed bills of sale and promissory notes in connection with multi-million-dollar transactions for these companies, despite having limited resources and little (if any) knowledge about gasification or biomass technology at the time;

- she reached out to, and coordinated with, Lambert to obtain independent auditor reports for the ABE, Concord Nurseries, and KGE applications;

- she supplied Lambert with information and documents for the independent auditor reports, including invoices to support the claimed project costs;

- she was regularly copied on e-mail correspondence regarding the projects;

- she signed a certification indicating that the gasification system for ABE had been "successfully tested" and was "ready for and . . . capable of operation";

- despite being the manager of ABE and the sole principal of Concord Nurseries and KGE -- all of which purportedly involved gasification systems -- she could not point IRS agents to a single gasifier during their visits in 2013;

- at least some of the grant funds were deposited into her bank account and used for her personal expenses;

- her name and contact information were listed in the signature block of OWE's 4854 application, suggesting that she might have personally submitted that application; and

- NREL's submission records listed her as the user who submitted the approximately $32 billion cost estimate in March 2013 in connection with the OWE project.

Based on this substantial evidence, a jury could have reasonably inferred that Metivier participated in the charged scheme with an intent to defraud the United States. See United States v. Alfonzo-Reyes, 592 F.3d 280, 291 (1st Cir. 2010) ("Direct

- 29 -

evidence is not required to find [a defendant] guilty, and juries are entitled to draw reasonable inferences at trial based on circumstantial evidence."). Her romantic relationship with Condron is yet another fact on which the jury could have relied to find that she shared Condron's criminal intent. See United States v. Pena, 910 F.3d 591, 597 (1st Cir. 2018) ("[T]he evidence plainly sufficed to permit the jury to infer that Rocheford, given her close ties to her mother and her broader involvement in the fraudulent scheme, was a knowing and willful participant in the scheme to defraud . . . ."); United States v. Ritz, 548 F.2d 510, 522 (5th Cir. 1977) ("The fact of the close association of the several parties and their association with . . . the father who was the source of four of the [counterfeit] bills is[] one circumstance from which the jury might infer knowledge.").

For these reasons, we are satisfied that the jury's verdict with respect to Count One "finds support in a plausible rendition of the record." Fuentes-Lopez, 994 F.3d at 71 (quoting Sabean, 885 F.3d at 46).

### 2. The Wire Fraud Counts

Counts Two through Four charged Condron with wire fraud. There are three elements of wire fraud: "1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the

scheme." United States v. Buoi, 84 F.4th 31, 38 (1st Cir. 2023) (citation omitted); see 18 U.S.C. § 1343. "False or fraudulent pretenses" include "any false statements or assertions" that the defendant made with knowledge of their falsity (or reckless indifference to their truth) and "with an intent to defraud." United States v. Correia, 55 F.4th 12, 26 (1st Cir. 2022).

Critically, the wire fraud statute encompasses not only "actual, direct false statements" but also "half-truths and the knowing concealment of facts." Id. (quoting United States v. Blastos, 258 F.3d 25, 28 (1st Cir. 2001)). And although a false representation must be material, to establish materiality here, the government did not need to prove that NREL or Treasury "actually relied on the falsehood." Id. at 27 (quoting United States v. Stepanets, 989 F.3d 88, 104 (1st Cir. 2021)). Rather, the government needed to demonstrate that Condron's representations "had a natural tendency to influence, or [were] capable of influencing [their] target's decision." United States v. Cadden, 965 F.3d 1, 12 (1st Cir. 2020) (citation and internal quotation marks omitted); see Neder v. United States, 527 U.S. 1, 16 (1999) ("[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" (second alteration in original) (citation omitted)).

We now turn to consider the sufficiency of the evidence with respect to each of the wire fraud counts.

### a. Count Two: The September OWE Placeholder Application

Count Two charged Condron with wire fraud in connection with an application that was numbered "2012E48WE214854" and requested a grant of $25,204,770 in relation to a "small wind energy property." The indictment suggested that the approximate date of the 4854 application's submission was September 28, 2012. At trial, the evidence established that the 4854 application was actually submitted two days later, on September 30, 2012.

Condron argues that the government failed to introduce "any evidence that the 4854 application itself was fraudulent," because the application did not seek any funds and was simply a "placeholder" application that "described estimated claims[] that might be made in the future." He also argues that the government did not introduce any evidence that he "had the requisite mental state for fraud when [he] submitted the 4854 application." In his view, the only evidence as to his state of mind at the time of the application's submission was a construction cost estimate that was submitted to NREL six months later in March 2013 (the "March cost estimate").[26] "Concluding from that filing that [he] had a

_____

[26] Recall that the March cost estimate projected a total cost of about $32 billion, which was more than $30 billion higher than the estimate Peña had prepared for Condron just one day prior.

particular mental state six months earlier," Condron argues, "is pure speculation and conjecture." Moreover, Condron stresses, the March cost estimate was not, as the district court concluded, "grossly inflated." For the reasons we explain below, we find no merit in these arguments.

First, the government was not required to prove that the 4854 application itself was fraudulent as long as it was submitted in furtherance of a scheme that relied on false pretenses. See United States v. Martin, 228 F.3d 1, 16 (1st Cir. 2000) (rejecting argument that defendant's emails, which did not contain any misrepresentations, could not provide the basis for a scheme to defraud because "the e-mails themselves need not be fraudulent" as long as "the scheme itself . . . rel[ies] on false pretenses"); see also Buoi, 84 F.4th at 38 (listing wire fraud elements). Thus, the fact that the 4854 application did not request grant funds is of little consequence. As Condron acknowledges, placeholder applications permitted grant-seekers with properties not placed in service by the end of 2011 to submit a later request for grant funds once their properties were placed in service. The deadline for placeholder applications was October 1, 2012, and the 4854 application was submitted on September 30, 2012. A jury could have reasonably concluded that Condron intended to meet the October 1 deadline so that he could later submit a request for grant funds in connection with the OWE project. Thus, a jury also could have

reasonably concluded that the submission of the 4854 application was in furtherance of Condron's fraudulent scheme. See United States v. Potter, 463 F.3d 9, 17 (1st Cir. 2006) ("[T]he [wire fraud] statute does not require that the scheme be 'executed' or that the [wire] be directed to the last step of the scheme.").

Second, a jury could have reasonably concluded that the 4854 application itself contained misrepresentations. The application indicated that OWE had begun "significant work of a physical nature on the property." But the only claimed "construction" OWE had completed at that time was "the purchase and inventory of 32,500 WiFi" thumb drives. A reasonable jury could have found that the purchase of such devices did not constitute "significant work of a physical nature," particularly for a project claiming an anticipated cost basis of about $84 million.[27] Such a finding would not have been "unreasonable, insupportable, or overly speculative" in light of the evidence. Daniells, 79 F.4th at 71 (citation omitted).

Third, we are not persuaded by Condron's argument that the March cost estimate was not fraudulent. He acknowledges that this estimate "contained a significantly higher total cost than

---

[27] At oral argument, Condron stressed that the government did not argue at trial that the 4854 application was fraudulent for relying on the purchase of 32,500 Wi-Fi devices to claim that OWE had begun construction. But regardless of what the government argued to the jury, the jury was entitled to draw its own inferences and conclusions from the evidence before it.

the one Peña provided to Condron" but notes that "this change was driven not by increasing the unit costs . . ., but by changing the number of units." But the March cost estimate was a staggering $30 billion higher than the cost estimate Peña had prepared, and Peña testified that it was not feasible for each barge to have the number of turbines that the March cost estimate suggested. Moreover, the approximately $32 billion estimate varied significantly from the approximately $84 million cost basis specified in the 4854 application. And there was no evidence suggesting that any significant work followed the 4854 application's submission such that it could have accounted for this major discrepancy.

Finally, the jury was entitled to consider the March cost estimate when determining whether Condron had an intent to defraud at the time the 4854 application was submitted. We long ago established "that subsequent events may shed light upon, and be relevant in determining, what transpired at an earlier time." United States v. Sutton, 970 F.2d 1001, 1007 (1st Cir. 1992). Accordingly, the jury could have appropriately inferred from the March cost estimate that Condron's fraudulent intent had developed by the time the application was submitted.

We therefore reject Condron's sufficiency challenge with respect to Count Two.

### b. Counts Three & Four:
### The January 11 & April 17, 2013 Responses to NREL

The alleged misrepresentations underlying Counts Three and Four were statements that Condron prepared (and Colman submitted) in response to requests from NREL seeking additional information about Brewer.  They are, in relevant part, as follows:

| Request From NREL | Response to NREL | Date of Response |
|---|---|---|
| Describe the relationship, past and present, between [Shirley Brewer] and with the owners of KGE and Concord Nurseries. | Owner of Industrial Supplies, LLC and is the contractor who sold turnkey operation to KGE.  She also sold [t]urnkey operation to Concord Nurseries.  Ms. Brewer has been [i]nvolved with alternative energy since the late 70's[,] specializing in thermal solar and biomass. | January 11, 2013 |
| Ms. Shirley Brewer is apparently a key individual in Industrial Supplies, LLC and Ocean Wave Energy, LLC as her information is provided on invoices as OWNER.  Please provide a complete description of Ms. Brewer's role in each company . . . . | Ms. Brewer . . . is the owner of Industrial Supplies, [LLC].  Industrial Supplies[,] LLC purchased the barge and sold the barge to OWE LLC.  Ms. Brewer has no relation to OWE LLC at all except as a vendor. | April 17, 2013 |

Condron argues that these responses to NREL cannot support a conviction for wire fraud because they "were literally true, comported with legal definitions of relevant terms, and were submitted by an attorney [i.e., Colman] with full knowledge of the

- 36 -

personal relationships of the parties." He also contends that his conviction on Count Four "fails for an independent reason," namely: "[t]he only 'scheme to defraud' relating to OWE was charged in relation to the [4854] application," but the response underlying Count Four was submitted in response to the 2428 application. We disagree and reject his sufficiency challenge to Counts Three and Four because we find that the statements underlying those counts were misleading, material, and in furtherance of the charged scheme to defraud.[28]

To begin, Condron's statements fall squarely within the ambit of the wire fraud statute. With respect to Count Three, a reasonable jury could have concluded that Condron not only misrepresented Brewer's experience in alternative energy but also knowingly omitted reference to her personal ties to Metivier. The evidence established that Brewer had no formal education or training related to energy or engineering and that she had worked as a nurse for 20 years until 2011. Her "involvement" with energy equipment was limited to buying and installing a wood-burning stove decades ago with her then-husband and familiarizing herself with a thermal solar system that he built at their home. And, as was repeated many times during the trial, her son (Condron) was in a

---

[28] Condron offers no argument as to how the submission of misleading statements by an attorney is relevant to (let alone supports) his sufficiency argument. We therefore do not address that point.

- 37 -

romantic relationship with Metivier, and she was the grandmother to their children. As for Count Four, a jury could have reasonably concluded that Condron's statement went beyond a "half-truth" or omission and rose to the level of an "actual, direct false statement[]." Correia, 55 F.4th at 26 (citation omitted). The evidence was straightforward: Despite the fact that Brewer was the grandmother to Metivier's children, and Metivier was the principal of OWE, Condron represented that "Brewer ha[d] no relation to OWE LLC at all except as a vendor."

Condron's assertion that the responses were literally truthful because Brewer had only a personal relationship to OWE and "there was no legal relationship, as defined in the relevant statutes, . . . to disclose" is not compelling.[29] (Citation omitted.) For the purposes of the wire fraud statute, that Section 1603 or Treasury's program guidance may not explicitly have required disclosure of the personal relationship between Brewer and Metivier does not immunize Condron's January 11 representation. See United States v. Lloyd, 807 F.3d 1128, 1153

_____

[29] To support this argument, Condron points to the language of Section 1603, which provides: "Terms used in this section which are also used in section 45 or 48 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 45 or 48." Pub. L. No. 111-5, § 1603(h), 123 Stat. 115, 366 (2009). Condron's reasoning is that sections 45 and 48 of the Internal Revenue Code would not classify Brewer (or her entities) as "related" to Metivier (or her entities) and, therefore, neither would Section 1603.

(9th Cir. 2015) (concluding that fraud charges based on affirmative misrepresentations, including affirmative "misleading half-truth[s]," do not require proof of a duty to disclose (citation omitted)); United States v. Keplinger, 776 F.2d 678, 697 (7th Cir. 1985) ("It requires no extended discussion of authority to demonstrate that omissions or concealment of material information can constitute fraud . . . under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation.").

Next, a reasonable jury could have further determined that Condron's representations in Counts Three and Four were material, as they "had a natural tendency to influence" NREL's decision to ultimately grant or reject one or more of the Section 1603 applications. Correia, 55 F.4th at 28. The fact that NREL "explicitly sought" information about Brewer "indicates that [Condron]'s response[] [was] capable of influencing its decision." United States v. Appolon, 715 F.3d 362, 368 (1st Cir. 2013). Indeed, Settle testified that information about Brewer's "relationship" with the owner of KGE and Concord Nurseries (i.e., Metivier) was important to NREL's determination of the OWE applications' credibility and claimed cost bases. And McCarten, an IRS agent, explained that understanding the relationship between a creditor and debtor (such as Brewer and Metivier) was

important to determining the actual value of a property and, in turn, the eligible cost basis.

Finally, we reject Condron's argument that his conviction on Count Four cannot stand because the evidence established that the April 17 statements were submitted in connection with the 2428 application, which the government conceded was not fraudulent.[30] In Condron's view, the fact that he did not make such statements in response to the 4854 application indicates that those statements were not submitted in furtherance of the scheme charged in the indictment. To be sure, Condron is correct that the evidence demonstrated his April 17 statements were technically submitted in response to NREL's questions about the 2428 application. But that is of little consequence here. The government's burden was to show that the April 17 response was submitted in furtherance of Condron's overall scheme to defraud, not the 4854 application specifically. Each of the more than 500 OWE applications listed Brewer of Industrial Supplies as the equipment vendor. And NREL reviewed each of those applications. A jury could have reasonably inferred that Condron anticipated that NREL's interest in Brewer's role would have extended to the

_____

[30] Before the government called its first witness at trial, it acknowledged that "[t]here were more than 500 applications submitted" for OWE and that "[t]he first one" (i.e., the 2428 application) was "not fraudulent because there was equipment bought" and the application claimed "only . . . $7,000."

- 40 -

other OWE applications (and even the ABE, Concord Nurseries, and KGE applications) and that he therefore prepared a response that would conceal the true nature of Brewer's role to further his scheme to defraud Treasury.

In sum, Condron's challenge with respect to Counts Three and Four fails because there was sufficient evidence for the jury to convict him on each count.

## B. Constructive Amendment and Prejudicial Variance

Condron also challenges his conviction with respect to Count Two on the basis that "the [g]overnment's argument amounted to a constructive amendment of the indictment, or, at the very least, a prejudicial variance that requires reversal." This argument rests on the premise that "[t]he government essentially invited the jury to view th[e] March 2013 upload" -- i.e., the approximately $32 billion cost estimate submitted in support of the 4854 OWE application -- "as the wire [for Count Two], instead of the" 4854 application itself.[31] Because he presented his prejudicial variance argument before the district court and therefore properly preserved it, we review that claim de novo. See Katana, 93 F.4th at 530. We normally would review Condron's

---

[31] To the extent Condron also bases his claims about Count Two on a discrepancy in the date the 4854 OWE application was submitted, he conceded at oral argument that such a discrepancy "[is] not itself a problem" and that the core issue was the "completely uncharged" March cost estimate.

constructive amendment argument claim, which he did not raise below, for plain error, but we conclude that it would fail even under de novo review.

We begin with a brief overview of the distinction between a constructive amendment and a prejudicial variance. The government constructively amends an indictment when its evidence or argument at trial alters the terms of the "indictment such that the defendant is effectively charged with a different offense than the one returned by the grand jury." Id. The prohibition against constructive amendments serves to safeguard a defendant's Fifth Amendment right to be indicted only by a grand jury and Sixth Amendment rights to be informed of those charges and not to be re-prosecuted for the same offense. See United States v. Akoto, 61 F.4th 36, 43 (1st Cir. 2023); United States v. Taylor, 848 F.3d 476, 495 (1st Cir. 2017). A variance -- which "does not involve a change in the offense charged" -- "occurs when the government relies at trial on different facts than those alleged in the indictment to prove the same offense." Katana, 93 F.4th at 530.

To distinguish between a claim of constructive amendment and that of a prejudicial variance, we look to the statutory elements of the offense charged. See id. at 531. The government's introduction of evidence at trial that varies from the factual allegations of the indictment, but does not alter a statutory element of the offense charged, does not amount to a constructive

amendment.  See United States v. López-Díaz, 794 F.3d 106, 118 (1st Cir. 2015).  Nor does it amount to a prejudicial variance, unless it affects a defendant's "right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and the right to prevent a second prosecution for the same offense."  United States v. Vega-Martínez, 949 F.3d 43, 51 (1st Cir. 2020) (cleaned up) (citation omitted).  With this framework in mind, we turn to Condron's constructive amendment and prejudicial variance claims, neither of which have merit.

The government's reliance on the March 2013 cost estimate in support of Count Two did not result in a constructive amendment or a variance.  First, because any emphasis on the March 2013 estimate did not alter any statutory element of the offense charged in Count Two (i.e., wire fraud), it did not amount to a constructive amendment.  See López-Díaz, 794 F.3d at 118 (rejecting constructive amendment claim because "[t]here was no change to the statutory elements of the offense"); see also United States v. Dupre, 462 F.3d 131, 140-41 (2d Cir. 2006) (finding no constructive amendment, where the only wire alleged in indictment was not proven at trial, because "the evidence at trial concerned the same elaborate scheme to defraud . . . as was described in the indictment").  Second, there was no variance because the government's argument at trial was clear that the 4854 OWE application was the basis for Count Two.  In its closing argument,

the government explained that the "first" charged wire was a "placeholder application" submitted on September 30, 2012 for OWE. The government also acknowledged that the indictment erroneously specified September 28, 2012 (rather than September 30) as the submission date of that application.[32] As we noted earlier, the government throughout trial focused on the 4854 application as an example of the placeholder applications submitted for OWE. We therefore find no support for Condron's assertion that the government improperly conflated the March 2013 estimate with the 4854 OWE application.[33]

Finally, even if the evidence at trial varied from the facts alleged in the indictment, Condron has failed to demonstrate that such a variance was prejudicial. Condron's claim of prejudice is that the government's "blurring [of] the 2428 placed-in-service and 4854 start-of-construction application[s] . . . invited the jury to . . . consider statements made only in connection with the

_____

[32] The government also noted that the court would provide the jury with "an instruction about an on-or-about date" and that the jury would "have to decide whether or not this wire took [place] . . . on or about September 30, 2012."

[33] Moreover, contrary to Condron's assertions, the government did not rely on the March cost estimate as the only piece of evidence demonstrating his intent to defraud at the time of the 4854 application's submission. As we explained earlier, the 4854 application itself offered insight into Condron's fraudulent intent at the time it was submitted. Additionally, the government reminded the jury that it had provided only "snippets of different exhibits" during its closing argument and that "all the[] exhibits [would] be in the jury room for [the jury] to consider."

2428 application as related to the 4854 application." He suggests that this "blurring" added to the "heightened risk that the jury [would] confuse evidence as to each count." But Condron offers no support for his assertion that the government "blurr[ed]" the two applications. As we have just explained, the government was clear that the 4854 OWE application was the basis for Count Two. Moreover, during its closing argument, the government referenced only a "placeholder application" submitted for OWE on September 30, 2012 (i.e., the 4854 application) and never mentioned any other application submitted by OWE (such as the placed-in-service 2428 application).

More importantly, Condron has not established that he was deprived of the "right to have knowledge of the charge [in Count Two] sufficient to prepare an effective defense and avoid surprise at trial" or "the right to prevent a second prosecution for the same offense." Vega-Martínez, 949 F.3d at 51 (cleaned up) (citation omitted). The fact that the government did not reference the March cost estimate in the indictment but did introduce the estimate at trial is insufficient to demonstrate that Condron lacked notice of the charge against him. After all, "[t]he government need not recite all of its evidence in the indictment." United States v. Fornia-Castillo, 408 F.3d 52, 67 (1st Cir. 2005) (citation omitted). And, notably, the government included "OWE Barge Cost Estimates," dated March 29, 2013, in its exhibit lists,

the first of which it filed in August 2020, more than a year before trial began. Additionally, when Condron cross-examined Peña, he largely focused on the March cost estimate. The record therefore belies any claim of surprise. Finally, Condron fails to establish how he might have prepared his defense differently had he been aware that the government would, as he claims, "concede the legitimate nature of [the] 2428 [application] and rest solely on claims of implausibility in the [March] cost estimate."

Thus, Condron has failed to demonstrate prejudice and, consequently, "grounds for reversal." Katana, 93 F.4th at 530 (citation omitted); see United States v. Chan, 981 F.3d 39, 52 (1st Cir. 2020) ("[A] variance is grounds for reversal only if it is prejudicial." (citation omitted)).

### C. The Government's Motion in Limine

Condron's final argument is that the district court erred when it restricted him from cross-examining Colman about the MRPC. In his view, Colman was "[t]he most critical witness" at trial, and "[t]he critical issue at trial was whether Condron acted in good faith." He argues that cross-examination of "Colman on the [MRPC] . . . would have both shed light on the question of his role[] and provided a basis for the jury to understand the expectations placed on attorneys, which in turn would inform the" jury's analysis as to whether Condron relied on Colman in good faith. The district court's restriction on such cross-

examination, Condron suggests, "undermin[ed] a key defense strategy" and amounted to an abuse of discretion.

We conclude, however, that the district court was well within its discretion when it imposed a narrow restriction on Condron's cross-examination of Colman and that such a restriction did not undermine his defense. Under Federal Rule of Evidence 403, district courts have broad discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We thus review the district court's decision under Rule 403 to limit the scope of Colman's cross-examination for abuse of discretion. See Vega-Martínez, 949 F.3d at 52-53; see also United States v. Soler-Montalvo, 44 F.4th 1, 16 (1st Cir. 2022) (highlighting "our deference for the district court's battlefield judgment" under Rule 403).[34]

Here, the district court properly balanced Condron's interest in cross-examining Colman about the MRPC against its concerns that such questioning would confuse the jury and/or elicit

---

[34] In challenging the district court's limitation on his cross-examination of Colman, Condron relies on Rule 403. He makes only a cursory reference to the Sixth Amendment's Confrontation Cause in one sentence in his reply brief. Accordingly, we focus our analysis here on whether the district court complied with Rule 403 when it limited the cross-examination.

testimony that was irrelevant to the issues at hand. As the district court reasoned, allowing Condron to cross-examine Colman about the MRPC would have "creat[ed] a mini trial about whether [Colman] violate[d] the Rules," which "would be a question for the Bar, not for this case." Because cross-examination of Colman with respect to the MRPC was likely to "distract the jury in an already complex case," the court "ha[d] discretion under Rule 403 to exclude such" questioning. United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008). Moreover, the probative value of the testimony that Condron sought to elicit regarding the MRPC as to whether he acted in good faith would have been marginal, at best. Thus, the district court did not abuse its discretion by preventing Condron from cross-examining Colman about the MRPC.

Finally, even if we were to assume that the district court's ruling was improper, Condron has not demonstrated that it undermined his defense. The court's ruling left ample room for Condron to advance his good faith defense via questioning of Colman. The court explicitly permitted Condron to cross-examine Colman about: whether he "was serving in his attorney capacity or in his business-advising capacity"; whether he charged appropriate contingency fees; and what he thought Condron "understood about [their] relationship based on their interactions and their communications." And defense counsel ably elicited testimony from Colman establishing that Condron knew Colman was an attorney and

that Colman had a "professional relationship" with Condron, was the "project attorney for all the[] projects in this case," and listed himself as an attorney in several documents submitted to NREL in connection with the Section 1603 applications. Defense counsel also established that Colman never advised Condron against being a vendor to Metivier's company (ABE) and that, at the time Colman and Condron were working on the Section 1603 applications, Colman knew Condron and Metivier were dating but did not believe they "had a legal relationship to disclose to the [Section] 1603 program." Additionally, Colman confirmed during cross-examination that clients have "the right to expect that their lawyers are competent" and will "keep them informed about the matters for which they [are] represent[ed]." We need not further scrutinize the trial record to conclude that the district court afforded Condron plenty of opportunity to effectively cross-examine Colman.

In sum, "[g]iven the undeniable authority of trial courts to place reasonable limits on cross-examination in order to cut off protracted discussion of marginally relevant subjects, it [was] well within the district court's discretion to limit" Condron's cross-examination of Colman about the MRPC. United States v. Coplin, 463 F.3d 96, 104 (1st Cir. 2006).

### III. CONCLUSION

For all these reasons, we **affirm** Condron's conviction on all four counts.